FILED
SCRANTON
OCT 08 2026
PER
DEPUTY CLERK

**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF PENNSYLVANIA**

Eric D. Bartels v. Jill E. Durkin
No. 3:26-cv-02620-KM
(Mehalchick, J.)

**COPIES OF CITED UNPUBLISHED OPINIONS**


| **Opinion** | **Pages** |
| --- | --- |
| *In re Barnes*<br>No. 12-65084-tmr7, Doc. 34 (Bankr. D. Or. July 16, 2013) | 2-11 |
| *In re Chicken Soup for the Soul Entertainment Inc.*<br>No. 1:25-cv-00052-GBW, Doc. 14 (D. Del. July 22, 2025) | 12-20 |
| *In re Decade, S.A.C., LLC*<br>No. 18-1880-MN, Doc. 14 (D. Del. Feb. 5, 2020) | 21-41 |
| *In re Malin*<br>No. 11-62288-WLH, Doc. 48 (Bankr. N.D. Ga. June 29, 2023) | 42-46 |
| *In re M & M Marketing, L.L.C.*<br>397 F. App'x 258, No. 10-2118 (8th Cir. Oct. 20, 2010) | 47-48 |
| *In re Narcisse*<br>No. 96-21345 (NHL), 2013 WL 1316706 (Bankr. E.D.N.Y. Mar. 29, 2013) | 49-73 |
| *In re Team Systems International, LLC*<br>No. 22-10066-CTG, Doc. 420 (Bankr. D. Del. Feb. 1, 2024) | 74-80 |
| *In re Team Systems International, LLC*<br>No. 24-3365 (3d Cir. Mar. 26, 2026) (not precedential) | 81-88 |


Page ranges refer to this combined PDF. Source opinions are reproduced in full; original opinion page numbers remain unchanged.

DISTRICT OF OREGON
**FILED**
July 16, 2013
Clerk, U.S. Bankruptcy Court

UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| IN RE<br><br>ALICE LEONA BARNES,<br><br>Debtor. | Bankruptcy Case<br>No. 12-65084-tmr7<br><br>MEMORANDUM OPINION |

This matter came before the court on the application of Trustee, Joseph Charter, to employ Marjorie Huff and her firm as special counsel for the Estate. Debtor has objected to the employment. After hearing on May 28, 2013, the matter was submitted on the record, which was augmented by Ms Hauf's supplemental declaration filed June 12, 2013.

**Background**:

In May 2006, Debtor Alice Barnes's son was involved in a motor vehicle accident in Las Vegas in a car titled to Debtor. Nancy White (nka Miller) was injured and brought suit for damages in Nevada (**First Nevada Action**). In that Action Ms White was represented by Marjorie Hauf and her firm Hauf and Ganz. Debtor was represented by the Watson Rounds firm. Evidently Debtor was a named insured on a policy issued by Nationwide Mutual Insurance Co. (**Nationwide**). In July 2009, Ms White obtained an approximate $60,000 judgment against Debtor. She later obtained an amended judgment which added approximately $13,700 in costs, for a total judgment amount of approximately $73,700 (**the judgment**).



AUTHENTICATED U.S. GOVERNMENT INFORMATION GPO

Debtor filed her Chapter 7 petition on November 30, 2012. Mr. Charter was appointed Trustee. Debtor listed only two debts on her schedules. One was to Rogue Federal Credit Union for $1,500, secured by a Chevy Tracker valued at $4,000. The other was to Ms White (noted as "Miller"), listed as general unsecured for $73,856 based on the judgment. On Schedule B, Debtor listed a potential claim against an insurance company and attorney concerning the First Nevada Action. The claim was given an "unknown" value.

On December 28, Debtor's section 341(a) meeting of creditors was held. On January 24, shortly after the Trustee filed an amended inventory indicating possible assets to administer, notice to creditors went out setting an April 23, 2013, bar date to file claims. As of today, no proofs of claims have been filed.

On February 15, 2013, the Trustee applied to employ Ms Hauf and her firm on a contingent fee basis to investigate and pursue a "bad faith" cause of action against Debtor's insurer, and malpractice claims against Debtor's former counsel, all deriving from the First Nevada Action.[1] The application was filed on LBF 753.95. As part of the form, Ms Hauf signed a verified statement (**First Declaration**) that she had read 11 U.S.C. §§ 101(14) and 327 and FRBP 2014(a), and that her firm had "no connections with . . . the debtor(s) [and] creditors" except that she "represented Nancy Yvonne Miller [White] in obtaining [the] underlying judgement against debtor." No other disclosures were made. Debtor objected to the application arguing Ms Hauf was not "disinterested."

On February 28, Debtor received her discharge.

On March 4, Ms Hauf apparently filed, on behalf of the Estate, a complaint in District Court for Clark County, Nevada, against Watson Rounds, Nationwide and various other parties, including Allied Insurance (**Second Nevada Action**). The complaint alleged multiple claims against Nationwide, many based on failure to protect Debtor's interest as its insured in the First Nevada Action. It also alleged claims for legal

---

[1]Under the proposed agreement, Ms Hauf would receive 40% of amounts recovered more than 90 days before the first setting for trial, and 45% of amounts recovered by settlement, judgment or award within 90 days of the first setting for trial or thereafter. Any costs advanced would be recovered after payment of attorney's fees.

malpractice against Watson Rounds. It sought compensatory or expectation damages for denied policy benefits, consequential damages, including emotional distress and attorney's fees in excess of $10,000, punitive damages in excess of $10,000, and costs. The complaint's allegations suggest the outstanding balance owed on the judgment at the time of the Chapter 7 petition was approximately $13,000.[2]

On March 18, the Trustee responded in support of the application arguing Ms Hauf met the Bankruptcy Code's disinterestedness requirements. He argued Ms Hauf was well-suited to work for the Estate based on her former involvement in the First Nevada Action. The Response attached a copy of the complaint filed in the Second Nevada Action.

On March 20, a hearing on the application was held. By Minute Order entered March 21, Ms Hauf was ordered to file a declaration by April 3, 2013, clarifying her representation of Ms White including any representation in the bankruptcy case. She was also ordered to disclose her fee arrangement with Ms White and whether she claimed an attorney's lien on the proceeds of the judgment. Response and reply deadlines were set.

On March 25, Ms Hauf filed her declaration (**Second Declaration**) wherein she stated that she previously represented Ms White in the First Nevada Action, that the Trustee had retained her to prosecute the Second Nevada Action, and that any proceeds derived therefrom would be estate assets. She further stated that the interests of "my prior client, Nancy White, and my current client, the Estate, are aligned," that she did not believe representing the Estate violated any of the Nevada Rules of Professional Conduct, and that the Trustee would be the final decision maker in the Second Nevada Action. The Second Declaration made no mention as to Ms Hauf's fee arrangement with Ms White or whether she claimed an attorney's lien on the proceeds of the judgment. Later that day, Ms Hauf filed an amended declaration (**Third Declaration**) repeating the statements made in the Second Declaration and adding that her fee agreement with Ms White in the First Nevada Action was on contingency, that she had not perfected an attorney's lien on the judgment, and that the First Nevada Action was now closed.

---

[2]The $13,000 may not include the amounts of potentially avoidable preferential garnishments or funds held in Ms Hauf's attorney trust account.

Debtor responded to the Third Declaration. Among other things, she raised concerns as to whether Ms Hauf's representation of Ms White had indeed terminated. She alleged Ms Hauf represented Ms White at the § 341(a) meeting of creditors. She also argued Ms Hauf had failed to comply with the Minute Order by failing to disclose her current fee agreement with Ms White.

The court then set a hearing on the application for May 28. The hearing notice advised that "[m]atters to be discussed are the proposed attorney's failure to address issues raised in the 3/21/13 minute order . . . ."

The Trustee responded to Debtor's continuing objections, advising that Ms Hauf appeared at the § 341(a) meeting at his invitation as she had earlier alerted him that a potential asset existed in the form of the claims asserted in the Second Nevada Action. He further advised Ms Hauf was not licensed to practice law in Oregon and, thus, could not have represented Ms White at the § 341(a) meeting.

At the May 28 hearing, the Trustee confirmed that the judgment had indeed been substantially satisfied and that if the Second Nevada Action was successful, it was quite possible this would be a surplus asset case. As to the pending application, Debtor raised her continuing disclosure and disinterestedness concerns, and I again raised concerns that the Second and Third Declarations had not adequately addressed the Minute Order's directives. In particular I needed to know whether Ms Hauf's representation of Ms White continued, and the scope of that representation. I further needed more information as to the contingency fee agreement with Ms White and whether that agreement would apply to any distribution from the Chapter 7 Estate. Ms Hauf was orally ordered to file a more detailed declaration within 21 days.

On June 12, Ms Hauf filed a supplemental declaration (**Fourth Declaration**). In it she declared that "[m]y firm continues an attorney-client relationship with Ms White as we continue to maintain her settlement funds in our trust account and update her on the status of the collection of her judgment." She further stated she was not licensed in Oregon and had not represented or provided legal advice to any of the participants in the Chapter 7 case other than her communications with the Trustee as to Debtor's possible claims against her insurer and former attorneys. She acknowledged that because the judgment had not been satisfied there were fees outstanding under her contingency fee agreement, and that "[c]urrently, Ms White's funds are in my

trust account and my fees will disburse with those funds." She advised that Nevada law gave her an automatic attorney's lien for her fees but that such lien was only perfected upon written notice to the client and she has not provided Ms White such notice. She further stated that in her opinion the Nevada Rules of Professional Conduct did not prohibit her from representing the Estate. Finally, she advised she had obtained the Trustee's written informed consent to represent the Estate, but had not obtained similar written informed consent from Ms White.

**Discussion**:

Ms Hauf's employment will be denied for two reasons. First, she has an actual, or at least a potential, conflict of interest. Alternatively, she has failed to meet the disclosure requirements of the Bankruptcy Rules.

**Conflict**:

Under § 327(a), a trustee may employ a professional, including an attorney, who does not hold or represent an interest adverse to the estate, and who is a disinterested person. (emphasis added). A "disinterested person" is someone who among other things is not a creditor and who "does not have an interest materially adverse to the interest of the estate . . . by reason of any direct or indirect relationship to, connection with, or interest in, the debtor, or for any other reason." §§ 101(14)(A), (C). (emphasis added). The "for any other reason" basis has been referred to as the "catch-all," Dye v. Brown (In re AFI Holding, Inc.), 355 B.R. 139, 149 (9th Cir. BAP 2006), aff'd and adopted by, 530 F.3d 832, 838 (9th Cir. 2008), and requires a totality of the circumstances, fact driven inquiry. Id. at 151-152.

Neither the Bankruptcy Code nor Rules define the term "adverse interest." In discussing the term the Ninth Circuit has stated:

> A generally accepted definition of "adverse interest" is the (1) possession or assertion of an economic interest that would tend to lessen the value of the bankruptcy estate; or (2) possession or assertion of an economic interest that would create either an actual or potential dispute in which the estate is a rival claimant; or (3) possession of a predisposition under circumstances that create a bias against the estate.

Dye, at 148-149.

In a Chapter 7 case, "a person is not disqualified from employment solely because of such person's employment by or representation of a creditor, unless there is an objection by another creditor or the United States trustee, in which case the court shall disapprove such employment if there is an actual conflict of interest." § 327(c). Where the trustee seeks to employ special counsel to work on a specific matter, as here, the conflict inquiry is directed towards the specific services to be performed. Stoumbos v. Klimnik, 988 F.2d 949, 964 (9th Cir. 1993); Fondiller v. Robinson (In re Fondiller), 15 B.R. 890, 892 (9th Cir. BAP 1981).

In applying § 327(c), Debtor, rather than a creditor or the United States trustee, has objected, as required by the statute. However, there is authority that I may sua sponte consider actual conflict issues stemming from dual representation. In re Am. Energy Trading Co., 291 B.R. 154, 157-158 (Bankr. W.D. Mo. 2003); In re Penney, 334 B.R. 517, 520 (Bankr. D. Mass. 2005); In re BH & P, Inc., 103 B.R. 556, 565 (Bankr. D. N.J. 1989), aff'd in part, rev'd in part and remanded on other grounds, 949 F.2d 1300 (3d Cir. 1991)). Under the unique circumstances of this case, where there is in essence only one unsecured creditor, and the conflict involves that creditor, I find it appropriate to follow the above line of cases and thus will consider sua sponte (i.e. independent of Debtor's objections) whether Ms Hauf has an actual conflict.

In determining whether a conflict exists, "[s]tate rules of professional responsibility apply, as long as they do not conflict with the Bankruptcy Code and/or the Bankruptcy Rules." Song v. Ehrenberg (In re Song), 2008 WL 6058782, *11 (9th Cir. BAP 2008). Here, because Ms Hauf will not be practicing before the Bankruptcy Court, but instead will be prosecuting the Second Nevada Action in Nevada state court, I turn for additional guidance to Nev. Rule of Prof. Conduct 1.7 which provides:

> (a) Except as provided in paragraph (b), a lawyer shall not represent a client if the representation involves a concurrent conflict of interest. A concurrent conflict of interest exists if:
>
> > (1) The representation of one client will be directly adverse to another client; or
> >
> > (2) There is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client, a former client or a third person or by a personal interest of the lawyer.

> (b) Notwithstanding the existence of a concurrent conflict of interest under paragraph (a), a lawyer may represent a client if:
>
> > (1) The lawyer reasonably believes that the lawyer will be able to provide competent and diligent representation to each affected client;
> >
> > (2) The representation is not prohibited by law;
> >
> > (3) The representation does not involve the assertion of a claim by one client against another client represented by the lawyer in the same litigation or other proceeding before a tribunal; and
> >
> > (4) Each affected client gives informed consent, confirmed in writing.

Ms White is the only unsecured creditor,[3] who Ms Hauf still represents in some capacity. Only a relatively small sum remains to be paid on the judgment. According to the Trustee, there is a distinct possibility that proceeds from the Second Nevada Action will be sufficient to put this case in surplus status. Additionally, Ms Hauf expects to be paid fees on a percentage basis from recoveries for the Estate and then also collect fees on a percentage basis from amounts paid to Ms White. Given those facts, Ms White's and the Estate's interests do not align, and Ms Hauf has an actual conflict. As the Trustee's counsel, she would be tasked with helping the Estate maximize its recovery for the benefit of all potential distributees, <u>including the Debtor</u>. <u>Song</u>, 2008 WL 6058782, at *9. On the other hand, her duty to Ms White runs simply to seeing the balance of the judgment satisfied. She also has a personal interest in recovering fees for her firm. These competing interests would be extant at all stages of the Second Nevada Action, including settlement discussions or trial. <u>See</u> <u>Duval Ranching Co. v. Glickman</u>, 930 F. Supp. 469, 473 (D. Nev. 1996) (impermissible conflict may arise if there may be substantially different possibilities for settlement or litigation strategy, citing ABA Model Rule 1.7 Official Comment). As such, there is a "significant risk" that Ms Hauf's representation of the Estate "will be materially limited" by her responsibilities to Ms White. Nev. R. Prof. Conduct 1.7(a)(2). Stated another way, because "it is plausible that the representation of . . . [Ms

---

[3]For purposes of my analysis, I will assume that at some point Ms White will file a proof of claim. Although it will be tardy, as the claims deadline has passed, it will nevertheless be entitled to distribution ahead of any surplus to the Debtor. § 726(a)(3), (6).

White] may cause . . . [Ms Hauf] to act . . . differently than . . . [she] would without that . . . representation, then . . . [she has] a conflict and an interest adverse to the estate." Gosser v. Arkison (In re Hammer), 2007 WL 7540944, *6 (9th Cir. BAP 2007) (quoting In re Leslie Fay Co's., Inc., 175 B.R. 522, 533 (Bankr. S. D. N. Y. 1994).[4]

What if Ms Hauf's conflict is only "potential" (i.e. presently dormant) instead of "actual"? Some courts have read §§ 327(a) and (c) as being complementary so as to allow inquiry into potential conflicts under § 327(a) in cases of dual representation, with the court having discretion to deny the application on that basis. See, e.g., In re Marvel Entm't Group, Inc., 140 F.3d 463, 476-477 (3d Cir. 1998). Others have held § 327(c) is in essence an exception to § 327(a) and thus inquiry is limited to actual conflicts in cases of dual representation. See, e.g., In re Sarao, 444 B.R. 496, 497-498 (Bankr. D. Mass. 2011). There does not appear to be controlling authority on this issue. However, Marvel Entertainment was cited with approval in the trustee qualification context by the Bankruptcy Appellate Panel in Dye, 355 B.R. at 154, adopted in toto, 530 F.3d 832, 838 (9th Cir. 2008), and in the present dual representation context in Gosser, 2007 WL 7540944 at *5. As such, it appears I may apply § 327(a) and exercise my discretion even if the conflict has not risen to "actual" status. For the reasons stated above, at least a potential conflict exists, and that is sufficient to deny the employment requested here.

**Disclosure**:

FRBP 2014(a) imposes disclosure requirements in large part to determine whether a professional meets the "no adverse interest" and "disinterestedness" requirements. Neben & Starrett, Inc. v. Chartwell Fin. Corp. (In re Park–Helena Corp.), 63 F.3d 877, 881 (9th Cir. 1995). The Rule requires that an application to employ a professional state, amongst other things "all of . . . [the proposed professional's]

---

[4] I have not overlooked that Rule 1.7(b)(4) allows the attorney in certain circumstances to engage in concurrent representation despite a conflict if she obtains written conflict waivers upon informed consent. However, the Rule also provides that such representation is only permitted if "not prohibited by law." Nev. Rule of Prof. Conduct 1.7(b)(3). In that regard, there is authority that such waivers are impermissible in the context of employment under § 327. U.S. Trustee v. S.S. Retail Stores Corp. (In re S.S. Retail Stores Corp.), 211 B.R. 699, 703 (9th Cir. BAP 1997). Even were waiver possible, per the Fourth Declaration, Ms Hauf has only obtained the Trustee's waiver, not Ms White's.

connections with the debtor, creditors, [and] any other party in interest . . . ." The Rule then requires the professional to submit an accompanying verified statement of any such connections.

> Full disclosure is an essential prerequisite for both employment and compensation. *Neben & Starrett, Inc. v. Chartwell Fin. Corp. (In re Park–Helena Corp.),* 63 F.3d 877, 881 (9th Cir. 1995). A professional has a duty to make full, candid and complete disclosure of all facts concerning his transactions with the debtor, and must disclose all connections with the debtor, creditors, and parties in interest, no matter how irrelevant or trivial those connections may seem. *Mehdipour v. Marcus & Millichap (In re Mehdipour),* 202 B.R. 474, 480 (9th Cir. BAP 1996).

Shat v. Kistler (In re Shat), 2009 WL 7809004, *6 (9th Cir. BAP 2009). Rule 2014's disclosure requirements are applied strictly. Neben & Starrett, 63 F.3d at 881-882. Even negligent or inadvertent failures may result in adverse consequences. Id. at 882. Upon failure to comply with disclosure requirements, employment may be denied or revoked, or other sanctions imposed "even if proper disclosure would have shown that the attorney had not actually violated any Bankruptcy Code provision or any Bankruptcy Rule." Id. at 880.

Here, despite repeated encouragement by the court, Ms Hauf's disclosures did not meet the above-criteria.[5] The First Declaration was wholly inadequate. It was couched in the past tense and failed to disclose that Ms Hauf's representation of Ms White is continuing. It also failed to disclose what percentage contingent fee she was charging Ms White, what fees were still owed (which, because they were a percentage of the recovery, would by necessity have required disclosure of the amount still owed on the judgment), and whether or not the attorney's lien given by Nevada state law would or could be pursued or perfected.[6] In response to the Minute Order detailing what was required as follow-up, the Second and Third

---

[5]While Debtor may not have had standing to raise actual conflict issues under § 327(c), she did have standing to raise disclosure issues in that she had a pecuniary interest in who prosecuted the Second Nevada Action as, per the Trustee's admission, there was a likelihood of a surplus estate. See In re Trepanier, 2010 WL 3881488, *2 (Bankr. N.D. Ill. 2010) (chapter 7 debtor has standing to object to claims if there is a reasonable probability of surplus); c.f., Duckor Spradling & Metzger v. Baum Trust (In re P.R.T.C., Inc.) 177 F.3d 774, 778, n.2 (9th Cir. 1999) (chapter 7 debtor has appellate standing if there is likely to be a surplus).

[6]See N.R.S. § 18.015.

Declarations continued the inadequacies. Finally, in response to a further court order, the Fourth Declaration filled in some of the disclosure holes, yet still left questions unanswered, such as the percentage contingent fee, the amount of fees outstanding, whether the attorney's lien would be pursued, and whether Ms Hauf considered a distribution to Ms White from the estate part of the proceeds/recovery upon which her contingent fee and/or lien would attach. These inquiries are all germane to the conflict/adverse interest analysis, as well as whether the proposed contingent fee, see n.1 supra, was reasonable.

As a rule, bankruptcy courts should not have to pry information from a prospective professional, as has been the case at bar. Initial disclosures should be as complete as possible. Follow-up disclosures should address in detail any prior inadequacies and, if applicable, the court's stated concerns. Ms Hauf has failed on these fronts, and, as such, the Trustee's application to employ will be denied on the alternative independent ground of inadequate disclosure.

The above constitute my findings of fact and conclusions of law under FRBP 7052. An appropriate order will be entered consistent therewith.

THOMAS M. RENN
Bankruptcy Judge

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE CHICKEN SOUP FOR THE SOUL ENTERTAINMENT INC., *et al.*, | : | Chapter 7 |
| | : | Case No. 24-11442 (MFW) |
| Debtors. | : | (Jointly Administered) |
| CHARLES MUSZYNSKI, | : | |
| Appellant, | : | |
| v. | : | |
| GEORGE MILLER, solely in his capacity as Chapter 7 Trustee, | : | Civ. No. 25-52-GBW |
| Appellee. | : | |

**MEMORANDUM**

## I. INTRODUCTION

This dispute arises in the Chapter 7 cases of debtor Chicken Soup for the Soul, Inc. and certain of its affiliates (together, the "Debtors"). Appellee George L. Miller, in his capacity as Chapter 7 Trustee for the Debtors' estates, seeks to dismiss (D.I. 8) (the "Motion to Dismiss") the above-captioned appeal filed by *pro se* appellant Charles Muszynski (the "Appellant") with respect to the Bankruptcy Court's January 14, 2025 Order (Bankr. D.I. 547)[1] (the "Retention Order"), which (i) granted the Trustee's application to retain Culpepper IP, LLLC (the "Culpepper Firm"), as special counsel to pursue copyright litigation; and (ii) overruled Appellant's objection to the application.

In his Motion to Dismiss, the Trustee asserts that Appellant lacks appellate standing to challenge the Retention Order. The Trustee further asserts that the appeal of the Retention Order must be dismissed because it is an appeal of an interlocutory order, and Appellant has not sought leave pursuant to Rule 8004(2)(a) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy

[1] The docket of the Chapter 7 cases, captioned *In re Chicken Soup for the Soul Entertainment Inc., et al.*, No. 24-11442 (MFW) (Bankr. D. Del.), is cited herein as "Bankr. D.I. __."



AUTHENTICATED U.S. GOVERNMENT INFORMATION GPO

Rules"). Even assuming that this Court treats Appellant's Notice of Appeal as a motion for leave to appeal pursuant to Federal Rule of Bankruptcy Procedure 8004(d)(1), the Trustee asserts that there is no basis for this Court to grant such leave. For the reasons set forth herein, the appeal of the Retention Order shall be dismissed for lack of appellate standing.

## II. BACKGROUND

On June 29, 2024 (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code. On July 10, 2024, the Bankruptcy Court entered an Order converting the cases from chapter 11 to chapter 7 of the Bankruptcy Code effective as of July 10, 2024. On July 11, 2024, the United States Trustee for Regions 3 and 9 appointed the Trustee as the Chapter 7 trustee of the Debtors' estates.

Prior to the Petition Date, the Debtors comprised one of the largest advertising-supported video-on-demand companies in the United States, with three flagship streaming services: Redbox, Crackle, and Chicken Soup for the Soul. Through Debtor Redbox Automated Retail LLC, the Debtors operated (i) Redbox Free Live TV, a free ad-supported streaming television service with approximately 180 channels, (ii) a transaction video-on-demand service, and (iii) a network of approximately 24,000 kiosks across the United States for DVD rentals.

Also prior to the Petition Date, Debtor Screen Media Ventures, LLC ("Screen Media") retained the Culpepper Firm to pursue copyright infringement litigation against various internet service providers. Specifically, the Culpeper Firm represented Screen Media, together with other plaintiffs, in litigation in the United States District Court for the Southern District of Florida against certain internet service providers, including Appellant and/or companies owned directly or indirectly by Appellant 1701 Management LLC d/b/a LiquidVPN, for alleged copyright infringement. It appears undisputed that Screen Media ultimately obtained a judgment against Appellant for $250,000 (the "Judgment") in that litigation. *See Millennium Funding, Inc., et al. v. 1701 Management LLC,*

*et al.*, 21-cv-20862-BB (S.D. Fla. Mar. 25, 2022), D.I. 213 (default judgment and permanent injunction). Appellant later filed a Chapter 7 bankruptcy in Puerto Rico, seeking to have the Judgment discharged; Appellant's Chapter 7 case was dismissed, however, and Appellant is currently appealing that order. *See In re Charles Muszynski*, Case No. 23-02870 (MCF) (Bankr. D.P.R. May 21, 2024), D.I. 185 (order dismissing Appellant's Chapter 7 case); *Muszynski v. Millennium Funding, Inc., et al.*, Case No. 24-11 (1st Cir. B.A.P. May 21, 2024) (Appellant's appeal of the order dismissing his Chapter 7 case). As of the Petition Date, the Culpepper Firm continued to represent Debtor Screen Media, together with its co-plaintiffs, in litigation to enforce the Judgment. Among other things, the Culpepper Firm sought to have the Judgment recognized and enforced in Nevis, where Appellant resides, leading to additional litigation. (*See* D.I. 8 at 3 (citing *Millennium Funding, Inc., et al. v. AUH2O, LLC, et al.*, Claim No. NEVHCV2022/0183 (Eastern Caribbean Supreme Court in The High Court of Justice St. Christopher and Nevis, Nevis Circuit); D.I. 9 at 5 (listing same litigation); Bankr. D.I. 552, Transcript of hearing held on Jan. 8, 2025 ("1/8/2025 Tr.") at 8:22-9:10).)

On December 6, 2024, the Trustee filed in the Bankruptcy Court an application seeking approval of the retention of the Culpepper Firm as special counsel (Bankr. D.I. 508) (the "Retention Application") *nunc pro tunc* to the Petition Date. Pursuant to the Retention Application, the Trustee sought authority to retain the Culpepper Firm pursuant to § 327(e) of the Bankruptcy Code to (i) continue representing Debtor Screen Media in the Judgment enforcement litigation with compensation based on a percentage of any recovery made on behalf of the Debtor, and (ii) represent the estates in any additional copyright infringement litigation that the Trustee may request that the Culpepper Firm pursue on behalf of the estates. On December 26, 2024, Appellant filed the *Objection to Trustee's Engagement of Special Counsel, Request for Disqualification of Culpepper IP, LLLC Pursuant to 105, 327(e), and 328(a) Request for Sanctions* (Bankr. D.I. 524) (the "Objection"). The Objection made numerous allegations regarding the Culpepper Firm and attorney Kerry Culpepper,

including alleged conflicts of interest which, according to Appellant, disqualified the Culpepper Firm from representing the Debtors' estates. Although difficult to follow, the Objection alleged that the Culpepper Firm is funded by PML Process Management Limited ("PML"), and that PML is a "third-party litigation funding company" which "profits from copyright trolling as a business" through "unethical legal practices." (Objection at 2-5.) The majority of the Objection alleges omissions and misrepresentations made by attorney Kerry Culpepper and the Culpepper Firm in the Southern District of Florida litigation which gave rise to the Judgment. Relevant to the Retention Application, however, Appellant's main contentions were (1) that the Culpepper Firm's post-petition representation of Debtor Screen Media in the litigation to enforce the Judgment constituted a violation of the automatic stay because the representation was without Bankruptcy Court authorization; and (2) that Mr. Culpepper's ownership of 42 Ventures, LLC—one of Screen Media's co-plaintiffs in the Southern District of Florida litigation—constituted a conflict of interest that disqualifies the Culpepper Firm from representing the estates.

At a hearing on the Retention Application held on January 8, 2025, both the Trustee, through counsel, and Appellant, *pro se*, presented argument. The Trustee asserted that Appellant's Objection was baseless, and further argued that Appellant is not a creditor of the Debtors, not a party in interest in the bankruptcy cases, and therefore lacked standing to challenge the Trustee's proposed retention of the Culpepper Firm on behalf of the estates. (*See* 1/8/2025 Tr. at 7:17–8:13 (counsel to the Trustee asserting that Appellant is not a creditor of the estates but rather a "judgment debtor … in connection with a $250,000 judgment which is held by the debtors"). Indeed, Appellant conceded that he was not a creditor of the Debtors. (*Id.* at 8:4–8:5 (THE COURT: "Well, you're not currently a creditor, Mr. Muszynski. You have no claim against the estate that's been confirmed by any court or by this Court." MR. MUSZYNSKI: "Yes, ma'am.").

The Bankruptcy Court questioned Mr. Culpepper and also heard argument with respect to the litigation against Appellant and other issues raised in the Objection. The Bankruptcy Court further allowed Appellant an opportunity to examine Mr. Culpepper with respect to matters bearing on the alleged conflicts of interest. (*See id.* at 8:18–21:14.) The Bankruptcy Court rejected Appellant's argument that Kerry Culpepper "has continued to litigate in violation of … the automatic stay in this case." (*Id.* at 30:13-23.) As the Bankruptcy Court explained to Appellant, "the automatic stay protects the debtor, not the defendants he is suing. A debtor can continue to prosecute actions against others. The automatic stay protects the debtors and the debtor's estate. So I think you have it in reverse. It doesn't protect you.") (*Id.* at 20:19-23.) Ultimately, the Bankruptcy Court approved the retention of the Culpepper Firm, finding that there were no conflicts of interest and that the terms of the retention were appropriate. (*See id.* at 22:6–23:3.) "Section 327(e) allows a party who has previously represented the debtor to now represent the trustee in that same manner," the Bankruptcy Court explained, finding it "perfectly appropriate that the trustee has selected to continue Mr. Culpepper's representation." (*Id.* at 22:22-23:1.) Regarding Appellant's argument that the Culpepper Firm also represented 42 Ventures and other plaintiff(s) in the Southern District of Florida litigation, the Bankruptcy Court did "not find any conflict in Mr. Culpepper representing this estate and the other plaintiffs in pursuing other parties that the other plaintiffs and the estate have similar claims against." (*Id.* at 22:6-9.)

On January 14, 2025, the Bankruptcy Court entered the Retention Order, overruling Appellant's Objection and granting the Retention Application. Appellant filed a timely Notice of Appeal. (D.I. 4 (amended and corrected notice).) On February 21, 2025, the Trustee filed the Motion to Dismiss. (D.I. 8.) On February 28, 2025, Appellant filed his response to the Motion to Dismiss (D.I. 9) (the "Response"). On March 11, 2025, the Trustee filed his reply in further support of the Motion to Dismiss (D.I. 10) (the "Reply"). On March 12, 2025, Appellant filed a Motion to Strike

the Trustee's Reply (D.I. 11) (the "Motion to Strike") on the basis that the Reply was untimely. The Trustee did not respond to the Motion to Strike.[2] No party requested oral argument.

## III. DISCUSSION

Although the Bankruptcy Code does not contain a provision for appellate standing, the Third Circuit has recognized that standing is a prerequisite to proceeding on appeal. *See In re Richardson Indus. Contractors, Inc.*, 189 Fed. App'x 91, 92 (3d Cir. 2006) (citing *In re Dykes*, 10 F.3d 184, 187 (3d Cir. 1993)). Appellate standing in bankruptcy is limited to "persons aggrieved" by an order of the Bankruptcy Court. *In re Revstone Indus. LLC*, 690 F. App'x 88, 89 (3d Cir. 2017) (citing *In re Combustion Eng'g, Inc.*, 391 F.3d 190, 214 (3d Cir. 2004)). The "persons aggrieved" test "now exists as a prudential standing requirement that limits bankruptcy appeals to persons whose rights or interests are directly and adversely affected pecuniarily by an order or decree of the bankruptcy court." *Combustion*, 391 F.3d at 214 (internal quotation marks omitted). To be a person aggrieved, a party must show that they are challenging an order that "diminishes their property, increases their burdens, or impairs their rights." *Id.* (internal quotation marks omitted). This standard is "more restrictive than the case or controversy" standing requirement of Article III, with respect to which the injury "need not be financial and need only be fairly traceable to the alleged illegal action." *Id.* at 215 (quoting *Travelers Ins. Co. v. H.K. Porter Co.*, 45 F.3d 737, 741 (3d Cir. 1995) (internal quotation

[2] Appellant's Motion to Strikes seeks to strike the Trustee's Reply on the basis that it was filed past the 7-day deadline set forth in Bankruptcy Rule 8013(a)(3)(B) ("Unless the district court or BAP orders otherwise ... the movant may--within 7 days after the response is served--file a reply that addresses only matters raised in the response"). Appellant's Certificate of Service attached to his Response indicates that it was delivered to the Court by "courier" and that it would be served on the Trustee "by way of the Court's CM/ECF system." (D.I. 9-1.) The date-stamped document reflects that this Court received Appellant's Response to the Motion to Dismiss on February 28, 2025. (*See* D.I. 9.) However, the docket of the appeal reflects that the Response was not docketed by this Court and electronically accessible on the Court's CM/ECF system until March 4, 2025. The Trustee filed his Reply on March 11, 2025, and within 7 days of the Court's docketing of Appellant's Response. The Court finds no hardship or prejudice to the Appellant. Accordingly, the Court will deny the Motion to Strike.

marks omitted). Rather, the Third Circuit requites the appealing party to be "directly affected" by the order not merely "exposed to some potential harm incident to the bankruptcy court's order." *Combustion*, 391 F.3d at 215. "This more stringent appellate standing requirement rests on the 'particularly acute' need to limit appeals in bankruptcy proceedings, which often involve a 'myriad of parties . . . indirectly affected by every bankruptcy court order." *Id.* (quoting *Kane v. Johns-Manville Corp.*, 843 F.2d 636, 642 (2d Cir. 1988)). Whether an appellant is a "person aggrieved" is generally a question of fact for the district court. *See In re Dykes,* 10 F.3d at 188.

While Appellant clearly takes issue with the merits of the underlying Judgment and litigation to enforce the Judgment, he has failed to show how he is "directly and adversely affected pecuniarily" by the Retention Order. Appellant asserts his "pending claims" against the Debtors' estates, but he points to no proof of claim he has filed against the Debtors nor does he explain how retention of special counsel affects those claims. It appears that Appellant's "pending claims" are in the nature of possible claims against the estates that he speculates may arise out of a possible dismissal of the ***already filed*** Nevis action to recognize and enforce the Judgment. (*See* D.I. 9 at p. 16 of 21 (asserting "the Nevis case will be thrown out," and as a result, "costs, fees, and penalties will be assessed to the Estates, the Trustee, and Culpepper.") Even assuming Appellant's prediction proves true, the Retention Order does not prevent Appellant from recovering any such costs and fees, and the Trustee will still need special counsel to represent him in any such matter. Simply put, the only apparent harm to Appellant is that the Culpepper Firm will continue to prosecute the Debtors' causes of action against Appellant and attempt to recover on the Judgment for the benefit of the Debtors' estates. But Appellant's rights and interests are not "directly and adversely affected pecuniarily" by the retention of this particular law firm because any special counsel retained by the Trustee on behalf of the estates will continue the already filed Judgment enforcement litigation against Appellant.

Appellant further asserts that the Trustee has contested Appellant's standing for the first time in this appeal and therefore has somehow waived the argument. (*See* D.I. 9 at 8-9 (asserting that arguments raised for the first time on appeal should be deemed waived).) As an initial matter, regardless of whether it was raised below, this Court must be satisfied that Appellant has appellate standing—that he is "person[] aggrieved" by an order of the Bankruptcy Court—as a prerequisite to hearing the appeal. *See In re Richardson*, 189 Fed. App'x at 92. Moreover, Appellant's argument that the issue of standing was never raised is belied by the record below, in which: (a) the Trustee, through counsel, asserted that Appellant lacked standing, as he was neither a creditor nor a party in interest (1/8/2025 Tr. at 7:17-7:24 ("Your Honor, I've parsed through pretty carefully the objection, and candidly I think that it's not really comprehensible, nor does it make sense. He is not a creditor, nor is he a party in interest."); (b) Appellant admitted that the Trustee was correct (*id.* at 8:4-8:6 ("And I should also say I may not be a creditor of the estate yet, but when he presses the case in Nevis and it loses, they lose, I will become a creditor."); and (c) the Bankruptcy Court agreed with the Trustee (*id.* at 8:10-8:12 ("Well, you're not currently a creditor, Mr. Muszynski. You have no claim against the estate that's been confirmed by any court or by this Court.").)

Appellant further points to Trustee's failure to object to Appellant's filing a notice of appearance in the Chapter 7 cases and Appellant's attendance and participation at various hearings. (*See* D.I. 9 at p. 9 of 21.) "Appellee obviously waived ability to object," Appellant argues, "by failing to timely do so at Appellant's multiple earlier appearances." (*Id.*) Again, this Court must determine as a threshold matter whether appellate standing exists, regardless of the bankruptcy proceedings. Appellant's waiver argument is unavailing. The Bankruptcy Code provides that "[a] party in interest, including the debtor, the trustee, a creditors' committee, an equity security holders' committee, a creditor, an equity security holder, or any indenture trustee, may raise and may appear and be heard on any issue in a case under this chapter." 11 U.S.C. § 1109(b). While this provision "confers broad

standing at the trial level," "courts do not extend that provision to appellate standing." *In re PWS Holding Corp.*, 228 F.3d 224, 249 (3d Cir. 2000)). So even assuming that Appellant was a party in interest with standing to be heard at the trial level, the appellate standard is necessarily more stringent based on the "particularly acute" need to limit appeals in bankruptcy proceedings: "if appellate standing is not limited, bankruptcy litigation will become mired in endless appeals brought by the myriad of parties who are indirectly affected by every bankruptcy court order." *Travelers,* 45 F.3d at 541 (quoting *Kane v. Johns-Manville Corp.*, 843 F.2d 636, 642 (3d Cir. 1988). That standard is not met here.

Appellant has failed to show that he is "directly and adversely affected pecuniarily" by the Retention Order and therefore lacks appellate standing to pursue the appeal. Based on the foregoing, the Court need not address the parties' arguments regarding whether the Retention Order is interlocutory.

## IV. CONCLUSION

As Appellant lacks standing to appeal the Retention Order, and the appeal will be dismissed. An appropriate Order will be entered.

Date: July 22, 2025

THE HONORABLE GREGORY B. WILLIAMS
UNITED STATES DISTRICT JUDGE

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE: DECADE, S.A.C., LLC, et al.,<br><br>Debtors. | ) ) ) ) | Chapter 7<br>Bankr. No. 18-11668 (CSS)<br>(Jointly Administered) |
| AARON GOODWIN and ERIC GOODWIN,<br><br>Appellants,<br><br>v.<br><br>DAVID W. CARICKHOFF, in his capacity as Chapter 7 Trustee for the Estates of DECADE S.A.C., LLC and GOTHAM S&E HOLDING, LLC, and 23 CAPITAL LIMITED,<br><br>Appellees. | ) ) ) ) ) ) ) ) ) ) ) ) ) | C.A. No. 18-1880-MN |

**MEMORANDUM OPINION**

Frederick B. Rosner, Jason A. Gibson, THE ROSNER LAW GROUP LLC, Wilmington, DE; Keith Miller, Gary Eisenberg, Adam Mandelsberg, PERKINS COIE LLP, New York, NY – Attorneys for Appellants

William P. Bowden, Ricardo Palacio, ASHBY & GEDDES, P.A., Wilmington, DE – Attorneys for Appellees

Alan Root, ARCHER & GREINER, P.C., Wilmington, DE – Attorneys for Chapter 7 Trustee

February 5, 2020

Maryellen Noreika
NOREIKA, U.S. DISTRICT JUDGE

This dispute arose in the Chapter 7 cases of Decade, S.A.C., LLC and Gotham S&E Holding, LLC ("Debtors"). Before the Court is an appeal by Aaron and Eric Goodwin (the "Goodwins") from (i) the Order entered November 5, 2018 (A004)[1] ("Settlement Order") approving the motion (A059) ("Settlement Motion") filed by appellee David W. Carickhoff, as Chapter 7 Trustee for the Debtors' estates, seeking approval of a settlement stipulation by and between the Trustee and appellee 23 Capital Limited (f/k/a XXIII Capital Limited) ("23 Capital," and, together with the Trustee, "Appellees"), pursuant to 11 U.S.C. § 105(a) and Rule 9019 of the Federal Rules of Bankruptcy Procedure; and (ii) the Order entered November 13, 2018 (A001) ("Retention Order") authorizing the Chapter 7 Trustee's retention and employment of Ashby & Geddes, P.A. and Troutman Sanders LLP as special litigation counsel to the Chapter 7 Trustee. The Settlement Order and the Retention Order were entered for the reasons stated at the November 5, 2018 hearing (A017-A056). For the reasons set forth herein, the Settlement Order and the Retention Order are affirmed.

## I. BACKGROUND

### A. Prepetition Facts and the Contract in Dispute

The Goodwins are leading sports agents who broker employment and endorsement contracts on behalf of their clients. (A245). In 1993, the Goodwins established Goodwin Sports Management, Inc. ("GSM") and Goodwin Associates Management Enterprises, Inc. ("GAME"; together with GSM, "the Goodwin Entities") to facilitate the Goodwins' management of their clients' endorsement contracts. (A243; A251).

---

1 The appendix (D.I. 8) filed in support of the Goodwins' opening brief (D.I. 7) is cited herein as "A__," and the appendix (D.I. 10) filed in support of the Trustee's answering brief (D.I. 9) is cited herein as "AA__."

On February 22, 2016, prior to the Petition Date, Debtors, certain of their subsidiaries and affiliates, and their former principals, Christopher Aden ("Aden") and Dorsey James ("James") entered into a Loan, Guaranty and Security Agreement dated as of February 22, 2016 ("the Loan Agreement") with 23 Capital. The Debtors' obligations to 23 Capital under the Loan Agreement, totaling more than $25.8 million, are asserted to be secured by liens on substantially all of their assets. (A074).

Subsequently, the Goodwins agreed to sell an interest in the Goodwin Entities to Christopher Aden and Dorsey James via their newly formed entity, Decade S.A.C. Contracts, LLC. (*See* A243-246). The Goodwins assert that prior to signing the agreement, Aden, James, and Decade replaced the negotiated terms of the parties' agreement with terms that were almost entirely unfavorable to the Goodwins and to which the Goodwins never would have agreed, including making 23 Capital a third-party beneficiary. (A249).

Goodwins assert that they have fulfilled their obligations under the agreement with Decade in accordance with the terms negotiated, and that Decade failed to make any of its required payments under the agreement, including a $3.5 million payment due to the Goodwins in early 2017. (A261). In 2017, the Goodwins provided notice that Decade had violated the terms of the parties' agreement and sought rescission of the agreement.

### B. The SDNY Litigation

In September 2017, 23 Capital commenced litigation before Judge Gregory H. Woods, of the U.S. District Court for the Southern District of New York (Case No. 17-civ-06910-GHW), against the Debtors, Aden, James, and the Goodwins in connection with the agreement ("the SDNY Litigation"). (*See generally* A212-A284). 23 Capital asserted claims against the Debtors and the other defendants for breach of contract and various forms of equitable relief. In the SDNY

Litigation, Debtors and the Goodwins filed counterclaims against 23 Capital and cross-claims against each other. (A161-A211; A212-A268). The Goodwins maintain that the agreement was invalid and unenforceable. (A263, A265, A266, A268).

The parties conducted document discovery in the SDNY Litigation pursuant to a case management order entered on October 31, 2017. (A269). On May 1, 2018, the SDNY Court entered an order substituting Troutman Sanders as counsel of record for 23 Capital. (A276). Following the suggestion of bankruptcy filed by the Debtors, the SDNY Court ordered the case automatically stayed as to those entities. (A280). On the Trustee's request, the SDNY Court subsequently ordered the SDNY Litigation stayed until November 12, 2018 (since further extended) to determine the question of ownership of the Goodwin Entities. (A282, A284).

### C. The Settlement Motion

On July 16, 2018 (the "Petition Date"), the Debtors each filed a voluntary petition for relief under chapter 7 of the Bankruptcy Code. (A061). On July 17, 2018, the Trustee was appointed as chapter 7 trustee of the Debtors' estates pursuant to section 701(a) of the Bankruptcy Code. (*Id.*).

On October 15, 2018, the Trustee filed motions with the Bankruptcy Court seeking approval of his stipulation of settlement ("the Stipulation") with 23 Capital and the retention of Troutman Sanders (*i.e.*, 23 Capital's attorneys from the SDNY Litigation) and Ashby & Geddes (together, "Special Counsel") as special counsel to pursue certain claims ("the Claims") on behalf of the estates. (A059-137). The Trustee's general bankruptcy counsel is Archer & Greiner, P.C., and Special Counsel's role is limited to the matters identified in the Stipulation. (A075).

The Stipulation resolves 23 Capital's and the Debtors' claims against each other by granting 23 Capital an allowed, secured claim of $25 million in each of the Debtors' cases, and

releases all claims the Debtors had against 23 Capital, including those claims that had been asserted in the SDNY Litigation. (A076-077). 23 Capital's allowed secured claim includes a lien on the Claims, and any recoveries on them, and represents a resolution of a dispute between the parties concerning whether 23 Capital's liens attached to commercial tort claims asserted by the Debtors, if any, or only to the recovery received by the Debtors on such claims. (A076). In exchange, 23 Capital agreed that it would fund the Trustee's investigation and prosecution of the Claims, would partially waive its lien on the Claims and their proceeds by sharing any recovery on the Claims with the Debtors' estates from the first dollar received, and would make a non-refundable advance payment to the estates of $75,000 on account of those recoveries. (A077-078). 23 Capital also agreed that it would not pursue an unsecured deficiency claim against the estates to the extent the recoveries on the Claims are insufficient to satisfy its allowed, secured claim. (A078). The Stipulation further provides that the Trustee, not 23 Capital, is responsible for directing the litigation of the Claims. (A075). The Stipulation also provides that, absent consent of the Trustee in writing, Special Counsel may not represent 23 Capital in connection with any disputes with the Trustee. (AA074).

The Goodwins objected to the proposed settlement and the proposed retention of 23 Capital's pre-petition counsel as a violation of the Bankruptcy Code's prohibition on the hiring of professional persons holding or representing interests adverse to the estate. (A138). The Goodwins assert that they are unsecured creditors by virtue of claims arising under the agreement, which agreement, the Goodwins have asserted in the SDNY Litigation, is invalid and void ab initio. The United States Trustee did not object to Special Counsel's retention, nor did any creditor other than the Goodwins.

On November 5, 2018, the Bankruptcy Court held a hearing on the Goodwins' objections to the proposed settlement and retention. (*See* A017). By way of proffer, counsel to the Trustee reiterated the points made in the Settlement Motion, including the Trustee's investigation of 23 Capital, through independent counsel, his evaluation of assets and claims, and the Trustee's exercise of his business judgment in determining to release 23 Capital on the terms reflected in the proposed Stipulation in order to obtain the best possible recovery to the estate on the Claims. With respect to the Settlement Motion, there was no objection to the proffer nor any request for cross-examination of the Trustee. (A031-042; A046-A050). With respect to the retention of Special Counsel, the Goodwins argued that case law makes clear that "representing the secured creditor and then representing the debtor is an inherent conflict" and "an actual conflict." (A039). The Goodwins further argued that Trustee had failed to establish that no law firm other than Troutman Sanders might be willing to take on the representation of the estates in the SDNY Litigation. (A041-A042). The Trustee argued that he should not be deprived of his choice of counsel unless his retention of Troutman Sanders presented an actual conflict of interest, and, by virtue of the Settlement Order, upon which entry of the Retention Order was conditioned, there would be no actual conflict of interest. The Trustee argued that, by virtue of the proposed Settlement, if approved by the Bankruptcy Court, the interests of the Trustee and 23 Capital would be completely aligned for the limited purpose for which litigation counsel was being retained. (A029).

In its bench ruling, the Bankruptcy Court noted that the two proposed orders, governing the retention of 23 Capital's prepetition counsel and settlement of claims asserted against the estates by 23 Capital, "really have to be discussed together; they're, obviously, meshed." (A051). The Bankruptcy Court first assessed the proposed settlement with 23 Capital and found that "the settlement, itself, clearly meets being superior to the lowest range of reasonableness and will be

approved." (A052). The Bankruptcy Court further approved the proposed retention on the grounds that 23 Capital's lawyers "don't meet any of the criteria [outlined in 11 U.S.C. § 327(a)] except possibly do they represent an interest adverse to the estates." (A053). The Bankruptcy Court determined that 23 Capital's lawyers did not represent an interest adverse to the estates because their "retention is contingent on the settlement that releases claims of the estate to 23 Capital and, of course, preserves 23 Capital's rights as a secured creditor . . . . There is no actual conflict because there are no claims between the parties nor do I think there's an appearance of impropriety or anything along those lines." (*Id.*)

The Bankruptcy Court entered the Retention Order and Settlement Order on November 5, 2018, and November 13, 2018, respectively. This appeal followed and is now fully briefed. (D.I. 7, 9, 11). The Court did not hear oral argument because the facts and legal arguments are adequately presented in the briefs and record, and the decisional process would not be significantly aided by oral argument.

## II. JURISDICTION AND STANDARD OF REVIEW

The Court has jurisdiction to hear an appeal from a final judgment of the bankruptcy court pursuant to 28 U.S.C. § 158(a)(1). In conducting its review of the issues on appeal, this Court reviews the Bankruptcy Court's findings of fact for clear error and exercises plenary review over questions of law. *See Am. Flint Glass Workers Union v. Anchor Resolution Corp.,* 197 F.3d 76, 80 (3d Cir. 1999). The Court must "break down mixed questions of law and fact, applying the appropriate standard to each component." *Meridian Bank v. Alten*, 958 F.2d 1226, 1229 (3d Cir. 1992).

Bankruptcy courts have broad discretion to evaluate and approve, or not, proposed settlements and courts generally defer to a trustee's business judgment when there is a legitimate

business justification for the trustee's decision to settle. *See, e.g.*, *Myers v. Martin (In re Martin)*, 91 F.3d 389, 393-95 (3d Cir. 1996). As a result, a bankruptcy court's decision to approve a settlement is reviewed under the abuse of discretion standard and should not be disturbed "unless there is a definite and firm conviction that the court committed a clear error of judgment in the conclusion it reached upon a weighing of the relevant factors." *Will v. Nw. Univ.* (*In re Nutraquest, Inc.*), 434 F.3d 639, 645 (3d Cir. 2006) (quoting *In re Orthopedic Bone Screw Prods. Liab. Litig.*, 246 F.3d 315, 320 (3d Cir. 2001)).

The Court also reviews a bankruptcy court's decision to approve an application for employment for abuse of discretion. *In re Pillowtex, Inc.*, 304 F.3d 246, 250 (3d Cir. 2002). "An abuse of discretion exists where the district court's decision rests upon a clearly erroneous finding of fact, an errant conclusion of law or an improper application of law to fact." *In re Marvel Ent'mt Group, Inc.*, 140 F.3d 463, 470 (3d Cir. 1998) (quoting *ACLU v. Black Horse Pike Reg'l Bd. of Educ.*, 84 F.3d 1471, 1476 (3d Cir. 1996)).

## III. ANALYSIS

### A. Settlement Order

Bankruptcy Rule 9019 provides that "[o]n motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement." FED. R. BANKR. P. 9019(a). This Rule gives bankruptcy trustees broad authority to settle disputes so long as the settlement is fair, reasonable, and in the interest of the estate, *In re Martin*, 91 F.3d at 393, *In re Nutraquest,* 434 F.3d 639, 644 (3d Cir. 2006), and meets the lowest level of reasonableness. *In re Pa. Truck Lines, Inc.*, 150 B.R. 595, 598 (E.D. Pa. 1992), *aff'd*, 8 F.3d 812 (3d Cir. 1993). The record reflects that, following an investigation of the Debtors' books and records, assets and liabilities and the claims that had been filed by and against them in the SDNY Litigation (A026-27; A063-064), as well as

the validity, nature, extent and priority of 23 Capital's claims, liens, and security interests under the loan agreement (A027; A063), the Trustee made a reasonable business decision to settle with the Debtors' senior secured lender. Among other things, the settlement avoided administrative insolvency for the estates by bringing in immediate cash and creating the potential for the estates to receive additional, unencumbered cash all without cost to the estates. Absent a settlement with 23 Capital, the Trustee would need to recover more than $25 million – without any practical ability to fund the necessary litigation – before other claimants would receive their first dollar.

The Goodwins contend that the Bankruptcy Court abused its discretion in entering the Settlement Order because that court did not apply the four-factor test established by the Third Circuit in *In re Martin* and approved the settlement even though it was not "fair and equitable." (*See* D.I. 7 at 18). The *Martin* factors require a court to consider the strengths and weaknesses of the claim being resolved, the cost and delay associated in pursuing the claim, and the general interest of creditors. *In re Martin*, 91 F.3d at 393. The record reflects that the *Martin* factors and related matters were discussed at length in the parties' submissions and at the Hearing. (A023-024, 027, 029-030, 051-052, 067). It is true that the Bankruptcy Court did not explicitly mention the *Martin* case in its analysis, but the record reflects that the Bankruptcy Court applied the relevant factors. Specifically, the Bankruptcy Court assessed and balanced the certain benefits afforded to the Debtors' estates by the entire settlement, with the possible, limited value of certain alleged claims held by the Debtors' estates against 23 Capital and compromised in the settlement, and the risks and complexities associated with litigating those claims. The Bankruptcy Court properly considered the benefits to the estates from the settlement, weighed them against the risk of not settling, and determined that the Trustee's business judgment in determining that the benefits outweighed the risks was sound.

The Goodwins further argue that the Bankruptcy Court abused its discretion in entering the Settlement Order because "it is impossible to evaluate what, if any, process in which the Trustee engaged in order to evaluate the bases and prospective value of the Estates' already-asserted claims against 23 Capital." (D.I. 7 at 18). The record, however, reflects that the Trustee detailed the factual and legal investigation he and his counsel undertook to evaluate the Debtors' claims against 23 Capital in the pleadings and proffer as well as his conclusion that "the merits of any potential claims against 23 Capital were speculative at best, would likely bring little value to the Debtors' Estates, and, at the same time, would be prohibitively expensive to prosecute, especially in light of the uncertainty of any results." (AA070). The Bankruptcy Court deferred to the Trustee's business judgment in settling those claims. (A051) ("I think that the business judgment of the trustee on those points really cannot be questioned . . ."); *In re Schipper*, 933 F.2d 513, 515 (7th Cir. 1991); *In re Martin*, 91 F.3d at 393-95 ("[c]ompromises are favored in bankruptcy" and courts generally defer to a trustee's business judgment when there is a legitimate business justification for the trustee's decision) (quoting 9 COLLIER ON BANKRUPTCY P 9019.03[1] (15th ed. 1993)); *In re Adelphia Commc'ns Corp.*, 327 B.R. 143, 159 (Bankr. S.D.N.Y. 2005) (in evaluating a settlement, the court "is permitted to rely upon 'opinions of the trustee, the parties and their attorneys'") (quoting *Int'l Distrib. Ctrs., Inc.*, 103 B.R. 420, 423 (S.D.N.Y. 1989)). Although the Bankruptcy Court's analysis was not detailed, the Court finds the standard met on this record, where the issues were clearly set forth in the pleadings and proffer and canvassed by the Bankruptcy Court. Under controlling law, the Bankruptcy Court was not required to undertake a detailed analysis of the factual and legal support for the Debtors' claims against 23 Capital that were settled and conduct a mini-trial of those claims to determine the reasonableness of the Trustee's decision to settle. *In re Neshaminy Office Bldg. Assoc.*, 62 B.R. 798, 803 (E.D. Pa. 1986)

("In determining whether to approve the trustee's application to settle a controversy, the Bankruptcy Court does not substitute its judgment for that of the trustee. 'Nor is the court to decide the numerous questions of law and fact raised by objections but rather to canvass the issues to see whether the settlement falls below the lowest point in the range of reasonableness.") (quoting *In re Carla Leather*, 44 B.R. 457, 465 (Bankr. S.D.N.Y. 1984)); *In re Chemtura Corp.*, 439 B.R. 561, 594 (Bankr. S.D.N.Y. 2010) (holding the bankruptcy court "need not conduct an independent investigation into the reasonableness of the settlement," nor is it necessary for the court to "conduct a 'mini-trial' of the facts or the merits underlying the dispute.") (citations omitted).

Finally, the Goodwins argue that the Bankruptcy Court erred in approving that portion of the Stipulation that grants 23 Capital a lien on the Debtors' commercial tort claims because those claims were not described with specificity as required by the Uniform Commercial Code. (D.I. 7 at 19). This argument is not persuasive. The UCC's rules about adequate descriptions of collateral in financing statements do not apply to settlements of disputed claims and resultant court orders approving those settlements. It is 23 Capital's position that even if its pre-petition lien did not cover commercial tort claims, it covered the proceeds of those claims such that any recovery on those claims would be for 23 Capital's benefit absent the Stipulation. (D.I. 9 at 12-13 (citing *City Sanitation, LLC v. Allied Waste Servs. of Mass., LLC (In re Am. Cartage, Inc.))*, 656 F.3d 82, 88-89 (1st Cir. 2011). Although the Goodwins may have meritorious arguments to the contrary, the Bankruptcy Court was not required to hold a mini-trial on each aspect of the parties' disputed claims against one another. The Trustee and 23 Capital resolved this dispute in the context of the global settlement, which was a reasonable exercise of the Trustee's business judgment and represented the only chance the Debtors had to try and realize any value flowing from the Debtors' commercial tort claims and was a good outcome in an uncertain litigation scenario, where it was

unlikely any other party would agree to fund the pursuit of those claims knowing the recovery was going to someone else.

Here, the Goodwins argue that the settlement is improper because 23 Capital will receive a lien on the Debtors' commercial tort claims which prevents the Goodwins, as purported unsecured creditors, from sharing in the recovery on those claims at a higher level. As the Bankruptcy Court correctly noted during the Hearing, it is an open question whether the Debtors' claims against the Goodwins are, in fact, commercial tort claims as opposed to contract claims, and, assuming some claims are tort claims, whether it would even be possible for a court to differentiate between recoveries on contract claims vs. tort claims. (A052) (". . . even if some of the claims being asserted, perhaps, aren't subject to the lien, most of the claims certainly are and we start to get into issues of whether a trial court is going to differentiate between which claim or which is subject to liability or not could be difficult. That could be litigated"). (A047). The Goodwins ignore this issue in the briefing. The Court agrees that the Trustee's decision to settle this disputed matter in the context of a global settlement with the Debtors' senior, secured lender is an appropriate exercise of his reasonable business judgment.

The Bankruptcy Court did not abuse its discretion in approving the settlement between 23 Capital and the estates, as the Bankruptcy Court canvassed the issues and the record supports the Bankruptcy Court's determination that the settlement satisfied the requirements of Bankruptcy Rule 9019 and was superior to the lowest range of reasonableness.

**B. Retention Order**

The Goodwins argue that the Bankruptcy Court erred as a matter of law in approving the Trustee's retention of Special Counsel, which according to the Goodwins, did not meet the requirements of § 327, as Special Counsel serves as counsel to a prepetition creditor, is not

"disinterested," and holds and represents interests adverse to the estates. (D.I. 7 at 10-19). The Goodwins also argue that the Bankruptcy Court erred because the "potential conflict" presented by Special Counsel's dual representation should have disqualified their retention. (D.I. 11 at 3-5). Because Special Counsel's retention was part of the Settlement, the Goodwins argue that both the Settlement Order and Retention Order must be vacated on this basis.

The Third Circuit has considered the statutory requirements for retention of counsel in several opinions. *See In re BH&P, Inc.*, 949 F.2d 1300 (3d Cir. 1991); *Marvel Ent'mt*, 140 F.3d 463; *Pillowtex*, 304 F.3d 246. In *Marvel Entertainment*, the Third Circuit "expressly reiterate[ed]" its earlier holding in *BH&P* that:

> (1) Section 327(a), as well as § 327(c), imposes a per se disqualification as trustee's counsel of any attorney who has an *actual conflict of interest*; (2) the district court *may within its discretion* – pursuant to § 327(a) and consistent with § 327(c) – disqualify an attorney who has a potential conflict of interest and (3) the district court may not disqualify an attorney on the *appearance of conflict* alone.

*Marvel Ent'mt*, 140 F.3d at 476 (emphasis added). Indeed, in *Marvel Entertainment*, the Third Circuit reversed the district court's disqualification of the trustee and the trustee's counsel because it was predicated on the appearance of a conflict. The Third Circuit held that, under section 327(a), the district court could disqualify counsel "only if it had an actual or potential conflict of interest." *Id.* at 477.

Under section 327(a) of the Bankruptcy Code, a trustee may employ one or more attorneys to represent him in carrying out his duties under the Bankruptcy Code, provided that such attorneys are "disinterested persons" and do not hold or represent an interest adverse to the estate. 11 U.S.C. § 327(a). The Third Circuit has explained that Section 327(a) sets forth two relevant standards for disqualification – one applicable to conflicts with the debtor's estate and one governing conflicts with other creditors. *Pillowtex*, 304 F.3d at 252 n.4. The first prohibits a professional from

"hold[ing] or represent[ing] an interest adverse to the estate." 11 U.S.C. § 327(a). The second, contained in the definition of "disinterested person," prohibits the retention of a creditor and further requires that a professional be free of "an interest materially adverse to the interest of . . . any class of creditors." 11 U.S.C. § 101(14). Thus, a professional may not have *any* conflict with the estate, but a conflict with creditors must be "material." *Id.*

The Goodwins argue that the Bankruptcy Court abused its discretion in approving Special Counsel's retention because Special Counsel is not disinterested and holds or represents interests adverse to the Estates. (D.I. 7 at 10-19).

**1. Special Counsel Does Not Hold an Interest Adverse to the Estates**

The Goodwins claim that Special Counsel is not a "disinterested person" because a portion of the allowed secured claim granted to 23 Capital by the Stipulation includes legal fees owed to Troutman Sanders. (D.I. 7 at 15). In the SDNY Litigation, 23 Capital obtained summary judgment against Aden and James, the Debtors' former principals, in the amount of $25,813,306.85, reflecting their liability as of July 6, 2019 on their personal guaranties of the Loan. (AA 090). The record on that motion established that 23 Capital's claim included $1,409,679.05 for "fees and costs XXIII has incurred in enforcing its rights under the Loan Agreement." (AA090). The record, however, reflects that all of those fees and costs were incurred by 23 Capital's prior law firm, Loeb & Loeb, and not by Troutman Sanders. (AA093-097). The Trustee submitted the relevant evidence to the Bankruptcy Court, and addressed the matter at the Hearing. (A029) ("Putting aside the legal significance of that issue, factually that's irrelevant, Your Honor, because the prepetition legal fees that make up a portion of the secured claim do not relate to Troutman or Ashby & Geddes. They relate specifically to former counsel for [23 Capital], Loeb & Loeb"). Special Counsel is not disqualified from serving as special counsel based on fees owed to Loeb & Loeb.

### 2. Special Counsel Does Not Represent an Interest Adverse to the Estates

In addition to precluding estate professionals from themselves being creditors of a debtor's estate, section 327(a) of the Bankruptcy Code provides that such professionals may not "represent an interest adverse to the estate." The Goodwins argue that the dual representation of a secured creditor and the Debtor is an "inherent conflict." Appellees argue that 23 Capital is not adverse to the estates because those parties' claims against each other have been resolved, and the interests of 23 Capital and the estates are fully aligned in attempting to recover from the Goodwins and others to maximize the value of the estates.

Although 23 Capital is a creditor of the Debtors, its claim has been allowed as a result of the Settlement Order, and any claims the Debtors had against 23 Capital have been released for the same reason. As the Bankruptcy Court determined, the Stipulation creates a unity of interest between 23 Capital and the Debtors relating to the matters for which Special Counsel has been retained by the Trustee. (A053 ("They do not represent an interest adverse to the estates because [their] retention is contingent on the settlement that releases claims of the estate to 23 Capital . . . they're not adverse. They all pull in the same direction. There is no actual conflict because there are no claims between the parties nor do I think there's an appearance of impropriety or anything along those lines.")) There is no longer any dispute between 23 Capital and the Debtors because of the entry of the Settlement Order. As a result, Special Counsel's separate representation of 23 Capital does not constitute representation of an interest adverse to the Debtors.

Even absent such a settlement, courts in similar cases regularly permit a chapter 7 trustee to retain a creditor's attorney as his own to pursue claims designed to augment the debtor's estate. *See, e.g., Stoumbos v. Kilimnik*, 988 F.2d 949 (9th Cir. 1993) (rejecting appeal from bankruptcy court order approving retention of creditor's lawyer as special counsel to chapter 7 trustee because,

among other things, the interests of the creditor and the trustee are aligned in trying to increase the size of the debtor's estate); *Bank Brussels Lambert v. Coan (In re AroChem Corp.),* 176 F.3d 610 (2d Cir. 1999) (affirming order approving retention of creditor's lawyer as special counsel to chapter 7 trustee where counsel had previously represented creditor in action against other creditor because the clients' interests were fully aligned in pursuing recovery against the objecting creditor); *In re Midway Motor Sales, Inc.*, 355 B.R. 26 (Bankr. N.D. Ohio 2006) (granting chapter 7 trustee's motion to retain as special counsel law firm that represented an unsecured creditor and separate secured creditor where the interests of the creditors and the trustee were aligned in maximizing the value of the estate); *In re RPC Corp.*, 114 B.R. 116 (M.D.N.C. 1990) (approving retention as special counsel to chapter 7 trustee of law firm that was also representing one creditor in action against another, where the purpose of retention was to investigate and file claims against same creditor law firm was already pursuing for its other client).

#### 3. The Goodwins Failed to Identify An Actual Conflict of Interest or Potential Conflict of Interest Requiring Disqualification

The Bankruptcy Code itself clarifies that a professional is not disqualified from employment solely because the professional represents the trustee and a creditor. *See* 11 U.S.C. 327(c). Instead, where, as here, there is an objection to counsel's retention, "the court shall disapprove such employment if there is an actual conflict of interest." 11 U.S.C. § 327(c). The Third Circuit has stated that "a conflict is actual, and hence per se disqualifying, if it is likely that a professional will be placed in a position permitting it to favor one interest over an impermissibly conflicting interest. *Pillowtex*, 304 F.3d at 251 (citing *BH&P*, 949 F.2d at 1315). "The term 'actual conflict of interest' is not defined in the Code and has been given meaning largely through a case-by-case evaluation of particular situations arising in the bankruptcy context." *BH&P*, 949 F.2d at 1315. The alleged conflict must relate to the specific matter for which special counsel

is retained. *Stoumbos*, 988 F.2d at 964. In other words, Special Counsel is disqualified only if there is a conflict between the Debtors and 23 Capital relating to the pursuit of the Claims.

The Goodwins raise several arguments to assert that there is an actual conflict of interest between Special Counsel's representation of 23 Capital and its representation of the Trustee as Special Counsel. The Goodwins also assert that the Bankruptcy Code categorically forbids retentions that pose a potential conflict of interest. (D.I 11 at 3-5). As set forth above, it was within the Bankruptcy Court discretion, pursuant to § 327(a) and consistent with § 327(c) – to disqualify an attorney on the basis of a potential conflict of interest. *See Pillowtex*, 304 F.3d at 251. Having reviewed the issues raised below, the Court concludes that the Goodwins have failed to identify any actual conflict of interest, as the interests of the Debtors and 23 Capital in maximizing the value of the estates are fully aligned. The Court further finds no abuse of discretion in the Bankruptcy Court's decision not to disqualify Special Counsel on the basis of the potential conflicts of interest identified by the Goodwins on appeal.

First, the fact that 23 Capital has separate claims against the Goodwins does not create a conflict of interest with the Debtors' pursuit of their own claims against the Goodwins. *See, e.g., RPC Corp.*, 114 B.R. at 120 (holding that the interests of the estate and the law firm's creditor clients were aligned in maximizing the value of the estate by pursuing litigation against a bank where the law firm was involved in pending litigation against the same bank and the two proceedings "both involve the same basic issues and are essentially the same claim against the Bank.")

Second, the fact that the Trustee has decided to grant an allowed secured claim to 23 Capital does not create an actual conflict of interest. The Goodwins claim that an actual conflict of interest exists between the Debtors and 23 Capital because the Trustee purportedly "abandoned"

challenges to 23 Capital's liens by entering into the Stipulation. (D.I. 7 at 12-13). This argument ignores underlying facts. Here, the Trustee investigated the nature, extent and validity of 23 Capital's liens and found them to be valid and duly perfected. The parties disagreed on the issue of whether 23 Capital's liens extended to the Debtors' commercial tort claims (if any) but resolved this dispute in the context of a global resolution that provided clear value to the estates. This is not an abandonment of any duty, but rather, as the Bankruptcy Court recognized, an appropriate exercise of business judgment in an effort to maximize the value of the estates for all creditors.

Next, the Goodwins argue that an actual conflict of interest exists because 23 Capital and the Debtors each have claims against them, and "the Goodwins may have offset rights against the Estates and/or 23 Capital." (D.I. 7 at 13). The unidentified and unexplained offset rights, according to the Goodwins, will manifest themselves when 23 Capital and/or the Debtors consider a "prospective resolution or settlement of claims" against the Goodwins and "will undoubtedly warp the loyalty of the common counsel for 23 Capital and the Estates." *Id.* The Trustee argues that this is but a reformulated version of the Goodwins' main argument that a lawyer cannot represent two clients that have different claims against a common adversary. The Court agrees. The Goodwins cite no authority for their claimed offset related actual conflict. With respect to the Goodwins' claim that a potential conflict may arise, the Court finds no abuse of discretion in the Bankruptcy Court's failure to disqualify Special Counsel on the basis of hypothetical offset rights the Goodwins may have in the future against claims that have not yet even been brought against them, or the other contingencies identified in the Goodwin's reply brief. (D.I. 11 at 4).

Next, the Goodwins argue that an actual conflict exists between the Debtors and 23 Capital because one of the Goodwins may be successful in defeating the Debtors' claims against him while

the other is not. (D.I. 7 at 13-14). This would, apparently, create a conflict between the Debtors and 23 Capital because Special Counsel would be then representing the Trustee as fiduciary for the victorious Goodwin brother while at the same time representing 23 Capital in the SDNY Litigation pursuing claims against that same brother. The Trustee argues that the SDNY Litigation is stayed, so to the extent this claimed actual conflict depends on that case proceeding, the Goodwins' argument is belied by the facts. The Court disagrees. It is clear, however, that Special Counsel is being retained to investigate and prosecute claims on behalf of the Debtors and not as general bankruptcy counsel – Archer & Greiner has that role. Any alleged conflict must relate to the specific matter for which special counsel is retained. *Stoumbos*, 988 F.2d at 964. The Court finds that, in the Goodwins' hypothetical, there would be no conflict because Special Counsel would not be representing the Trustee as a fiduciary for the victorious Goodwin brother. The limited scope of Special Counsel's representation relates to the prosecution of the Claims and would not include the representation of the estates in such matters.

The Goodwins next argue that there is an actual conflict between the Debtors and 23 Capital concerning document production in the SDNY Litigation because the Debtors did not comply with their discovery obligations in that case. (D.I. 7 at 14). According to the Goodwins, Special Counsel will have to cure the Debtors' document production defects while at the same time "protecting and enhancing 23 Capital's litigation position" which, according to the Goodwins is "an untenable and inherent divergence of interests" that creates an actual conflict of interest between 23 Capital and the Debtors. *Id.* The Goodwins, however, do not explain how this conflict will manifest itself now, as the SDNY Litigation is stayed during the Debtors' bankruptcy. The Goodwins also argue that an actual conflict exists between the Debtors and 23 Capital concerning "disputes over disbursements of Estate proceeds" and "fundamental aspects of litigation strategy."

(D.I. 7 at 10). This argument, again, ignores the terms of the Stipulation and the limited role for which Special Counsel is retained. The Trustee and 23 Capital have already agreed on the disbursement of the proceeds of the Claims and that agreement has become an order of the Bankruptcy Court by the entry of the Settlement Order. The parties also agreed that the Trustee, not 23 Capital, controls the prosecution of the claims. (A075). To the extent there are disagreements between the parties, the parties' agreement is clear that Special Counsel may not be involved in those. (AA074).

The Goodwins' final claimed conflict between the Debtors and 23 Capital is based on the Debtors' scheduling the Goodwins as creditors of the Debtors. (D.I. 7 at 14). According to the Goodwins, this means that "it is impossible to expect" that the Trustee will fulfill his fiduciary duty to the Goodwins as creditors because the lawyers representing the Trustee in suing the Goodwins also represent another party that is also suing the Goodwins. *Id.* The Goodwins' argument, however, if taken to its logical conclusion, would mean that, contrary to 11 U.S.C. § 327(c), a law firm could never represent a creditor and a trustee "as bankruptcy cases not infrequently require a trustee to act against the interests of some creditors for the benefit of the estate as a whole." *In re Johnson,* 312 B.R. 810, 824 (E.D. Va. 2004). *See, also, RPC Corp.*, 114 B.R. at 120 (holding that the interests of the estate and the law firm's creditor clients were aligned in maximizing the value of the estate by pursuing litigation against a bank where the law firm was involved in pending litigation against the same bank and the two proceedings "both involve the same basic issues and are essentially the same claim against the Bank.")

The Bankruptcy Court did not abuse its discretion in approving the Trustee's retention of Special Counsel. Following the Bankruptcy Court's approval of the Settlement, any conflict between 23 Capital and the estates was resolved thus removing any impediment to Special Counsel

serving as estate professionals. The Stipulation creates a unity of interest between the parties and makes the law firms 'disinterested' within the meaning of the relevant provisions of the Bankruptcy Code. There is no actual conflict of interest between the Debtors and 23 Capital concerning their mutual claims against the Goodwins, and having considered the potential conflicts raised by the Goodwins, the Court finds no basis to conclude that Bankruptcy Court abuse its discretion in entering the Retention Order.

## IV. CONCLUSION

For the reasons set forth herein, the Settlement Order and Retention Order are affirmed. A separate Order shall be entered.

**IT IS ORDERED as set forth below:**

**Date: June 29, 2023**

Wendy L. Hagenau

**Wendy L. Hagenau**
**U.S. Bankruptcy Court Judge**

---

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | |
|---|---|
| IN RE: | CASE NO. 11-62288-WLH |
| KEVIN LOGAN MALIN, | CHAPTER 7 |
| Debtor. | |

**ORDER GRANTING MOTION TO INTERVENE**

**THIS MATTER** is before the Court on the Motion to Intervene filed by Denis Mathews ("Mr. Mathews") (Doc. No. 44) (the "Motion").

Debtor filed for Chapter 7 bankruptcy relief on April 25, 2011. His case was discharged and subsequently closed on December 16, 2011. On November 16, 2018, the United States Trustee filed a Motion to Reopen Chapter 7 Case (Doc. No. 15), seeking to reopen the bankruptcy case to appoint a trustee to investigate and administer a personal injury claim that arose pre-petition. The bankruptcy case was reopened on November 16, 2018 (Doc. No. 16), and Debtor amended the schedules to disclose a claim against the Bridgeport (CT) Catholic Diocese (the "Diocese") (Doc. No. 33). A bar date for filing proofs of claim was set, but no creditors filed proofs of claim. The



AUTHENTICATED
U.S. GOVERNMENT
INFORMATION
GPO

Chapter 7 Trustee filed a Report of No Distribution, and the bankruptcy case was closed on July 5, 2019.

On April 19, 2023, the Debtor filed another Motion to Reopen Chapter 7 Case (Doc. No. 37). Debtor seeks to reopen his Chapter 7 bankruptcy case to "correct the information regarding a potential asset from the time of the filing of the original case." More specifically, Debtor seeks to disclose a lawsuit he filed against Mr. Mathews in the Connecticut Superior Court, which Debtor contends is part of or a continuation of the claim against the Diocese. Mr. Mathews filed a Response (Doc. No. 38) in opposition. The Court held a hearing on the Motion to Reopen on May 18, 2023, during which it invited additional briefing on reopening the case. Debtor thereafter filed a Brief in Support of the Motion to Reopen Chapter 7 Case (Doc. No. 43), in which he argued Mr. Mathews is not a "party in interest" and lacks standing to object to reopening the case.

On June 7, 2023, Mr. Mathews filed the Motion seeking to intervene with respect to the Motion to Reopen Chapter 7 Case pursuant to Federal Rule of Bankruptcy Procedure 2018(a). He contends he has a direct legal and financial interest in the resolution of Debtor's request to reopen his Chapter 7 case and no other person or entity can adequately represent his interests. On June 22, 2023, Debtor filed a response in opposition to the Motion (Doc. No. 47). Debtor contends Mr. Mathews can present his defenses in the Connecticut action.

The procedure for intervening is governed by Federal Rule of Bankruptcy Procedure 2018. Fed. R. Bankr. P. 2018; see also Resolution Trust Corp. v. Russell Corp. (In re Russell Corp.), 156 B.R. 347, 349 (Bankr. N.D. Ga. 1993). The rule provides, "[i]n a case under the Code, after hearing on such notice as the court directs and for cause shown, the court may permit any interested entity to intervene generally or with respect to any specified matter." Fed. R. Bankr. P. 2018(a). "In order to establish cause under [Rule 2018], a party must establish that it has an economic or similar

interest in the matter which is not adequately represented and that intervention would not result in undue delay or prejudice." In re Russell Corp., 156 B.R. at 349. The case law regarding Rule 2018 "authorizes a very broad and elastic interpretation as to those entities entitled to . . . intervenor status—in the discretion of the court to suit the particular case before it." In re Pub. Serv. Co. of New Hampshire, 88 B.R. 546, 554 (Bankr. D.N.H. 1988).

Courts have permitted entities to intervene on motions to reopen in certain cases. For example, in In re Narcisse, 2013 WL 1316706, at *3 (Bankr. E.D.N.Y. Mar. 29, 2013), the court found the debtor's motion to reopen would likely affect the continuation of a related personal injury action pending in state court. And the purported intervenor could have become indebted to Debtor's estate if there was a recovery in the personal injury action and would therefore be impacted by the reopening. The court found the purported intervenor had sufficient interest to be heard on the debtor's motion to reopen. See also In re Potter., 2021 WL 4494263, at *4 (Bankr. D.N.J. Sept. 30, 2021) (noting, in considering a motion to reopen, that Bankruptcy Rule 2018(a) provides the court may permit intervention).

Debtor seeks to reopen his Chapter 7 case to disclose a lawsuit against the purported intervenor. There are no creditors who stand to benefit from reopening the case. Thus, whether to reopen the case boils down to a dispute between the Debtor and Mr. Mathews. Mr. Mathews' interests are not protected by any party to the estate. The resolution of the motion to reopen may affect the continuation of the pending action against Mr. Mathews in the Connecticut courts. The determination of whether to reopen the bankruptcy case will thus impact him. Accordingly, the Court will exercise its discretion to permit Mr. Mathews to intervene on the Debtor's Motion to Reopen Chapter 7 Case. Accordingly,

**IT IS ORDERED** that the Motion is **GRANTED**.

**END OF DOCUMENT**

**Distribution List**

Gus H. Small
Benjamin S. Klehr
Small Herrin, LLP
100 Galleria Parkway
Suite 350
Atlanta, Georgia 30339

J. Hayden Kepner, Jr.
J. Robert Williamson
Scroggins & Williamson, PC
4401 Northside Parkway
Suite 450
Atlanta, GA 30327

Susan H. Senay
Kelly Thomas
Matthew T. Berry & Associates
Suite 600
2751 Buford Highway NE
Atlanta, GA 30324

# United States Court of Appeals
**FOR THE EIGHTH CIRCUIT**

---

No. 10-2118

---

<table>
<tr><td>In re: M & M Marketing, L.L.C.,<br><br>Debtor,<br>-----------------------------------------<br><br>Michael L. Blumenthal,<br><br>Appellee,<br><br>v.<br><br>Richard D. Myers,<br><br>Appellant,<br><br>Jerry Cronk; Cheryl Cronk;<br>Jerome Langdon; Coleen Langdon;<br>Phillip Cronk; Lorraine Cronk,<br><br>Appellees,<br>-----------------------------------------<br><br>In re: Premier Fighter, L.L.C.,<br><br>Debtor,<br>-----------------------------------------<br><br>Michael L. Blumenthal,<br><br>Appellee,<br><br>v.</td><td>*<br>*<br>*<br>*<br>*<br>*<br>*<br>*<br>*<br>*<br>*<br>*<br>*<br>*<br>*<br>*<br>*<br>*<br>*<br>*<br>*<br>*<br>*<br>*<br>*<br>*<br>*<br>*<br>*<br>*<br>*<br>*<br>*</td><td>Appeal from the United States<br>Bankruptcy Appellate Panel<br>for the Eighth Circuit.<br><br>[UNPUBLISHED]</td></tr>
</table>

| | | |
|---|---|---|
| | * | |
| Richard D. Myers, | * | |
| | * | |
| Appellant, | * | |
| | * | |
| Jerome Langdon; Coleen Langdon; Ryan Cronk; Jeremiah McAndrew, | * | |
| | * | |
| Appellees. | * | |

---

Submitted: October 15, 2010
Filed: October 20, 2010

---

Before LOKEN, MURPHY, and BENTON, Circuit Judges.

---

PER CURIAM.

After the trustee of the bankruptcy estates of M&M Marketing L.L.C. and Premier Fighting, L.L.C. employed counsel to assist him in connection with the estates, creditor Michael L. Blumenthal moved to disqualify counsel based on a conflict of interest. The bankruptcy court denied the motion but the Bankruptcy Appellate Panel (BAP) reversed, and this appeal followed. Following careful review, we agree with the BAP that the trustee's attempt to justify the employment by arguing that counsel was employed for a special purpose fails: 11 U.S.C. § 327(e) governs special-purpose representation, and that statute is inapposite here, where counsel did not previously represent the debtors. We agree further that counsel held an interest adverse to the estates, because he was also serving as attorney for several creditors who held interests adverse to the estates. See In re Vote, 276 F.3d 1024, 1026 (8th Cir. 2002); United Artists Theatre Co. v. Walton, 315 F.3d 217, 225 (3d Cir. 2003)). Accordingly, we affirm. See 8th Cir. R. 47B.

---

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK

---------------------------------------------------------------x

In re

WILDY NARCISSE,

Debtor.

---------------------------------------------------------------x

Chapter 7
Case No. 96-21345 (NHL)

# MEMORANDUM DECISION GRANTING DEBTOR'S MOTION TO REOPEN CHAPTER 7 CASE

*Appearances*:

Rachel Blumenfeld, Esq.
26 Court Street
Brooklyn, New York 11242

Gregory J. Cannata, Esq.
Alison Cannata-Hendele, Esq.
233 Broadway, 5th floor
New York, New York 10279

Attorneys for the Debtor

Michael A Cardozo
Corporation Counsel
of the City of New York
100 Church Street
New York, New York 10007
By: Zachary B. Kass, Esq.

Attorneys for the City of New York

**HONORABLE NANCY HERSHEY LORD**
**UNITED STATES BANKRUPTCY JUDGE**

Before the Court is a motion by Wildy Narcisse, the former debtor (the "Debtor") seeking an order to reopen his chapter 7 case (the "Motion to Reopen") pursuant to section 350(b) of the Bankruptcy Code and Federal Rule of Bankruptcy Procedure 5010. The Debtor seeks reopening fifteen years after his bankruptcy case was closed to allow a chapter 7 trustee to prosecute a previously undisclosed personal injury action (the "Personal Injury Action") against the City of New York (the "City").

On March 25, 2012, the Debtor filed the Motion to Reopen (ECF Nos. 9, 10). In support of the Motion to Reopen, the Debtor claims that the failure to disclose the Personal Injury Action in his bankruptcy filings was an omission made in good faith. At the time of the bankruptcy filing, he argues, he was represented by incompetent bankruptcy counsel. He was unable to evaluate his counsel's performance, he says, because he was suffering from a traumatic brain injury sustained in the accident underlying his personal injury claim. The Debtor claims that he had no motivation to conceal the Personal Injury Action from his creditors.

On April 16, 2012, the City of New York (the "City") filed opposition to the Motion to Reopen (the "Opposition") (ECF Nos, 12, 13). The City argues that the Motion to Reopen should be denied because the Debtor cannot show that his failure to disclose the Personal Injury Action was made in good faith. The City further argues that there will be no benefit to creditors if the case is reopened. On April 23, 2012, the Debtor filed a Reply to the Opposition (ECF No. 16).

On June 28, 2012, the Court held a hearing on the Motion to Reopen at which Rachel Blumenfeld, Esq., counsel for the Debtor in this bankruptcy case, Gregory J. Cannata, Esq., counsel for the Debtor in the Personal Injury Action, and Zachary B. Kass, Esq., counsel for the City, appeared and were heard. On July 2, 2012, the Court entered an Order Scheduling

Evidentiary Hearing (ECF No. 21) which, after several adjournments, was heard on November 29, 2012 (the "Evidentiary Hearing").

Based on the entire record, including the testimony, exhibits and the arguments of counsel, and for the reasons set forth below, the Court concludes that the Debtor has shown cause to reopen his chapter 7 case.

## Jurisdiction

This Court has jurisdiction pursuant to 28 U.S.C. §§ 1334(b) and 157(b)(1), and the Eastern District of New York standing order of reference dated August 28, 1986, as amended by order dated December 5, 2012. This is a core proceeding pursuant to 28 U.S.C. §157(b)(2)(A). The following are the Court's findings of fact and conclusions of law to the extent required by Rule 52 of the Federal Rules of Civil Procedure, as made applicable by Rule 7052 of the Federal Rules of Bankruptcy Procedure.

## Background

On September 4, 1995, the Debtor alleges that while walking in a parade, he was hit by a police vehicle owned and operated by the City (the "Accident"), causing him to sustain a traumatic brain injury and other physical injuries. Prior to the Accident, the Debtor, who was approximately 30 years old at the time, supported himself and his family working full time for a heath care agency. Since the Accident, the Debtor has been unable to work and has been declared permanently disabled by the Social Security Administration.

On November 3, 1995, the Debtor, by his personal injury attorney, filed a Notice of Claim with the City alleging that it was liable for his injuries. On January 26, 1996, the Debtor testified before an Examiner for the New York City Comptroller's Office regarding his Notice of Claim.

The Debtor was represented by counsel at that hearing.

***The Debtor's Bankruptcy Filing***

On November 25, 1996 (the "Petition Date"), the Debtor, represented by bankruptcy counsel, filed a chapter 7 petition in this Court. John S. Pereira, Esq. was appointed the chapter 7 trustee in this case. The Debtor did not list his claim against the City in his Schedules or Statement of Financial Affairs.[1] The Debtor's Schedule F lists a total of $8,047.16 owed to six unsecured creditors. Five of those creditors hold credit card debt and one bank holds a loan. The Debtor's Schedule D lists a secured debt to the Internal Revenue Service of $800. The Debtor listed assets of minimal value and claimed them all as exempt.

The Section 341 meeting of creditors was held on January 7, 1997, the Debtor was examined, and the meeting was closed. The chapter 7 trustee filed a "Trustee's Report of No Assets–Debtor(s) Examined." The Debtor received a discharge on June 6, 1997. A final decree was entered and the chapter 7 case was closed on June 18, 1997.

***The City's Discovery of the Bankruptcy Case***

The Personal Injury Action was commenced in the New York state court on December 3, 1996. The Debtor alleges that his personal injury attorney was unaware of his bankruptcy filing when the lawsuit was commenced. The City interposed an Answer on January 3, 1997. On November 11, 2010, the Debtor filed a Note of Issue and Certificate of Readiness, placing the Personal Injury Action on the state court trial calendar.

The City first became aware of the Debtor's bankruptcy filing in early February 2012 when the trial in the Personal Injury Action was scheduled to begin. The City quickly took steps to

[1] *See* Affirmation of Jonathan D. Klein in Support of the Opposition (the "Klein Affirm."), Exh. A (certified copy of the Debtor's bankruptcy case file); Debtor's Exh. 1 (same).

obtain the Debtor's bankruptcy case file from the federal archives. On February 23, 2012, the City moved in the New York state court to dismiss the Personal injury Action on grounds that the Debtor lacked standing to maintain the action. The City argued that Debtor's failure to list the claim as an asset in his bankruptcy case caused the claim to remain the property of the bankruptcy estate, thereby precluding the Debtor from pursuing the claim on his own behalf. The Debtor cross-moved in the New York state court for a stay so that he could move to reopen his bankruptcy case and list the Personal Injury Action as an asset. The Debtor also moved in the New York state court, for the first time, for the appointment of a guardian ad litem. The New York state court adjourned the trial and the City's motion to dismiss to give the Debtor the opportunity to make this Motion to Reopen.

## Legal Discussion

### *Whether the City has Standing to Object to Debtor's Motion to Reopen*

In Debtor's Reply to the City's Objection to the Motion to Reopen, he claims that the City lacks standing to object. The Debtor argues that the City's status as a defendant in the Personal Injury Action, and that alone, does not make it a party in interest with respect to this bankruptcy case. The Debtor cites to *In re Sweeney*, 275 B.R. 730, 733 (Bankr. W.D. Pa. 2002) and *In re Ayoub*, 72 B.R. 808, 812 (Bankr. M.D. Fla. 1987) in support of his position. The City did not file a response to the Debtor's objection to the City's standing in this matter.

While Bankruptcy Rule 5010 provides that a "case may be reopened on motion of the debtor or other party in interest pursuant to § 350(b) of the Code," standing to oppose a motion to reopen is not addressed by the Bankruptcy Code or the Bankruptcy Rules. Similarly, the term "party in interest" is not defined in the Bankruptcy Code or Bankruptcy Rules. Section 1109(b) of

the Bankruptcy Code, applicable in chapter 11 cases, provides a list of examples of what persons or entities may be considered to be a party in interest "including the debtor, the trustee, a creditors' committee, an equity security holders' committee, a creditor, an equity security holder, or any indenture trustee." 11 U.S.C. § 1109(b). Who may be a party in interest, however, is non-exclusive. *See* 11 U.S.C. § 102(3) ("'includes' and 'including' are not limiting").

Courts differ in their determinations of whether a party who is a defendant in a state court action has standing to oppose the reopening of a bankruptcy case. *See In re Lewis*, 273 B.R. 739, 743 (Bankr. N.D. Ga. 2001) (state court defendants can oppose motion to reopen because of impact reopening would have on them on both forums); *In re Koch,* 229 B.R. 78, 82 (Bankr. E.D.N.Y. 1999) (defendant had standing as owner of property); *In re Riazuddin*, 363 B.R. 177, 182-83 (10th Cir. BAP 2007) (state court defendant did not have standing to oppose the motion because its liability would be affected by the state court action but not by the bankruptcy case); *In re Sweeney*, 275 B.R. at 733 (defendants do not have standing in bankruptcy case simply because they have standing in the state court action).

Here, the City, by its counsel, appeared and was heard at the initial hearing on the Motion to Reopen. The Court provided notice to the City of a further evidentiary hearing and directed both the Debtor and the City to submit pre-hearing pleadings. The City, by its counsel, appeared and was heard at the Evidentiary Hearing. The Motion to Reopen will likely have an effect on the continuation of the Personal Injury Action in the New York state court. *See In re Lewis*, 273 B.R. at 743. And, the City may become indebted to this bankruptcy estate if there is a recovery in the Personal Injury Action. These factors will, accordingly, impact the City. Bankruptcy Rule 2018 provides that the court may allow any "interested entity" to intervene in a bankruptcy case or "any

specified matter." FED. R. BANKR. P. 2018(a). Based on the foregoing, the Court finds that the City has sufficient interest to be heard in the Debtor's Motion to Reopen.

The Court now turns to the Motion to Reopen and several principles of bankruptcy law which are fundamental to this Motion.

***Property of the Estate***

The commencement of a bankruptcy case creates an estate which, subject to certain exceptions not relevant here, is comprised of all legal or equitable interests of the debtor in property as of the commencement of the case. 11 U.S.C. § 541(a)(1). *See Chartschlaa v. Nationwide Mut. Ins. Co.*, 538 F.3d 116, 122 (2d Cir. 2008), *cert. denied*, 129 S.Ct. 1534 (2009) (property of the bankruptcy estate encompasses "'[e]very conceivable interest of the debtor, future, nonpossessory, contingent, speculative, and derivative. . . .' Contractual rights clearly fall within the reach of this section . . . as do causes of action owned by the debtor or arising from property of the estate." (internal citations omitted)).

Thus, at the moment the Debtor filed his petition, his claim against the City became property of his bankruptcy estate. *See Hopkins v. Foothill Mt., Inc., (In re Hopkins)*, 346 B.R. 294, 303 (Bankr. E.D.N.Y. 2006) ("[I]t is well settled that prepetition causes of action are assets included within the meaning of property of the estate.").

***The Debtor's Duty to Disclose***

To be sure, a debtor's duty to disclose all his legal and equitable interests in property is fundamental to the bankruptcy process. Section 521 of the Bankruptcy Code sets forth a debtor's disclosure obligations at the commencement of the case. Specifically, Section 521(a) requires the debtor to file a schedule of assets and liabilities, 11 U.S.C. § 521(a)(1)(B)(ii), which must include

all property that falls within the broad ambit of Section 541(a), including any unliquidated causes of action existing as of the commencement of the case. *See Chartschlaa*, 538 F.3d at 122 (holding that an individual must "disclose all his interests at the commencement of a case. . . ."). This disclosure is "essential to the proper functioning of the bankruptcy system." *Id.*; *see also Rosenshein v. Kleban*, 918 F.Supp. 98, 104 (S.D.N.Y 1996) ("The integrity of the bankruptcy system rests on full and honest disclosure by debtors of all of their assets."). Moreover, the debtor's duty to disclose "is a continuing one and does not end with the filing of the bankruptcy petition." *In re Lowery*, 398 B.R. 512, 515 (Bankr. E.D.N.Y. 2008).

***The Role of the Chapter 7 Trustee***

In a chapter 7 case, property of the estate is administered exclusively by the designated fiduciary—the chapter 7 trustee. *See* 11 U.S.C. § 323; *In re Arana,* 456 B.R. 161, 169 (Bankr. E.D.N.Y. 2011), *appeal dismissed, Mount Sinai Hosp. v. Arana*, No. 11-CV-5360 (RRM), 2012 WL 3307357 (E.D.N.Y. Aug. 12, 2012) ("Only the Chapter 7 trustee may administer property of the estate, including bringing actions on behalf of the estate."). Therefore, "during the pendency of a bankruptcy case, the debtor does not have standing to initiate or pursue an action based on a prepetition claim unless the trustee abandons it back to the debtor." *Id.* at 170.

When a debtor fails to disclose an asset, the asset remains property of the estate until administered or abandoned by the trustee, even after the case was closed. *In re Clark*, BAP No. CC–11–1322–KiMkH, 2012 WL 1911926, at *6 (9th Cir. BAP May 25, 2012); 11 U.S.C. § 554(d) (property not abandoned or administered remains property of the estate.)

> Abandonment presupposes knowledge. Thus, there can, as a rule, therefore be no abandonment by mere operation of law of property that was not listed in the debtor's schedules or otherwise disclosed to creditors. This principle is recognized in section 554(c) which provides that, unless the court orders otherwise,

> property of the estate that is neither abandoned nor administered in the case remains property of the estate. Likewise, property which is improperly or ineffectively abandoned remains property of the estate pursuant to section 554(d).

5 COLLIER ON BANKRUPTCY, ¶ 554.03 (16th ed. 2012).

The undisclosed Personal Injury Action was neither administered nor abandoned by the chapter 7 trustee. Accordingly, the Personal Injury Action remains property of this bankruptcy estate and the chapter 7 trustee is the proper party in interest to prosecute the lawsuit.

***The Standards for Reopening***

Motions to reopen are governed by section 350(b) of the Bankruptcy Code and Bankruptcy Rule 5010. Section 350(b) of the Bankruptcy Code states, in pertinent part that a "case may be reopened in the court in which such case closed to administer assets, to accord relief to debtor, or for other cause." Bankruptcy Rule 5010 provides, in pertinent part, that "[a] case may be reopened on motion of the debtor or other party in interest pursuant to § 350(b) of the Code. . . ."

While the time for filing a motion to reopen a bankruptcy case is not limited by the Bankruptcy Code or the Bankruptcy Rules, courts recognize that the laches doctrine may bar reopening when there is unreasonable delay and prejudice to the affected party by the delay. *See In re Arana*, 456 B.R. at 174 (citing *In re Stein* 394 B.R. 13, 16 (Bankr. E.D.N.Y. 2008) and *Robins Island Pres. Fund, Inc. v. Southhold Dev. Corp.*, 959 F.2d 409, 423 (2d Cir. 1993)). However, "[t]he mere lapse of time does not constitute prejudice, and '[a] court of equity must consider whether reopening a case would prejudice the adversary's position.'" *In re Stein*, 394 at 16 (quoting *Batstone v. Emmerling) In re Emmerling,* 223 B.R. 860, 964 (2d Cir. BAP 1997)).

Although the Bankruptcy Code does not provide a definition of "cause," courts have held that cause to reopen a bankruptcy case includes the need to amend schedules to add assets or

creditors, or to commence lien avoidance actions. *In re Stein*, 394 B.R. 13, 15 (Bankr. E.D.N.Y. 2008) (citing cases)); *see also Zinchiak v. CIT Small Bus. Lending Corp. (In re Zinchiak),* 406 F.3d 214, 224 (3d Cir. 2005) ("It is well recognized that a bankruptcy proceeding may be reopened to administer estate assets and to determine whether additional assets may be available for creditors of the estate."). And, as noted by the court in *Stein*: "When a case has been closed, courts have held that the court 'has a duty to reopen the estate whenever there is proof that it has not been fully administered,' and to permit the addition of an asset to the schedules." *In re Stein*, 394 B.R. at 16 (citing *Lopez v. Specialty Rests. Corp. (In re Lopez),* 283 B.R. 22, 27 (9th Cir. BAP 2002)(internal citations omitted)).

A bankruptcy court has broad discretion in deciding whether to reopen a closed case. *In re Arana*, 456 B.R. at 172. The decision to reopen "invoke[s] the exercise of a bankruptcy court's equitable powers, which is dependent upon the facts and circumstances of each case." *Katz v. I.A. Alliance Corp. (In re I. Appel Corp.)*, 104 Fed. Appx. 199, 200 (2d Cir. 2004).

The Debtor, as the moving party, has the burden of establishing cause to reopen. *In re Arana*, 456 B.R. at 172 (citing *In re Mortensen*, 444 B.R. 225, 227 (Bankr. E.D.N.Y. 2011)). Factors used in determining whether to reopen a closed case include the benefit to creditors, the benefit to the debtor, the prejudice to the affected party, and other equitable factors. *In re Stein,* 394 B.R. at 15 (stating that "courts may consider equitable concerns" and "the benefit to the debtor, the prejudice to the affected entity and the benefit to the creditors") (internal quotation marks and alterations omitted); *In re Koch*, 229 B.R. 78, 85-86 (Bankr. E.D.N.Y. 1999).

The good faith or lack of good faith by the debtor is a significant factor. *In re Arana*, 456 B.R. at 172; *In re Koch,* 229 B.R. at 87-88 (observing that "[t]he lack of the element of good faith

suggests an all too casual disregard for the disclosure requirements of this Court, and the fair and equitable treatment of [the debtor's] creditors as called for by the Bankruptcy Code, since they did not benefit from the reopening"); *In re Lowery*, 398 B.R. at 515 (citing with approval those courts that conclude that "good faith is an important element that a court looks to in authorizing the reopening of a bankruptcy case to include a lawsuit of the debtor").

***Demonstration of Good Faith and Cause to Reopen in This Case***

The Debtor argues that his case should be reopened to allow him to amend his bankruptcy filings to include the Personal Injury Action because his failure to disclose its existence was an omission made in good faith; the Personal Injury Action is an asset of the estate that should be administered for the benefit of his creditors; and the City should not be permitted to receive a windfall at the expense of creditors.

The City argues that the Debtor concealed the Personal Injury Action in bad faith. The Debtor pursued the Personal Injury Action in his own name for some fifteen years notwithstanding that he lacked standing to do so, the City claims, and only when the City discovered the existence of the bankruptcy case did the Debtor file the instant motion. The City also points to the Debtor's failure to disclose his claim on his petition and schedules when filed, failure to reveal the existence of his claim at the Section 341 meeting of creditors, and failure to amend his schedules to disclose the Personal Injury Action. In sum, the City argues that the Debtor did not act in good faith because he had knowledge of the undisclosed claim and had motive for concealment.

The City relies upon *In re Lowery*, 398 B.R. 512 (Bankr. E.D.N.Y. 2008) for its assertion of bad faith. In *Lowery*, the court denied the debtor's request to reopen her case some eight years after closing in order to schedule a personal injury action. The defendant in the personal injury

case, the City of New York, opposed the reopening. Holding that the case should not be reopened, the court stated that good faith of the debtor was an important factor to be considered in deciding whether to reopen the case. *Lowery*, 398 B.R. at 515. The court reasoned that "[t]he public interest in the systemic integrity of the bankruptcy process dictates that a bankruptcy court should withhold relief that encourages the concealment of assets by debtors." *Lowery*, 398 B.R. at 516. The court in *Lowery* found that the debtor did not act in good faith and that her omission was not inadvertent. *Id.* As discussed below, the facts and evidence pertaining to the Debtor's good faith are very different from the facts in *In re Lowery*.

In determining whether the debtor acted inadvertently or in bad faith, courts consider whether the debtor has knowledge of the potential claim or a motive to conceal it. *See In re Lowery*, 398 B.R. at 515-16 ("[t]he absence of good faith in nondisclosure may be inferred from the record. As a general proposition, a debtor's failure to satisfy a statutory disclosure duty may be deemed inadvertent or the product of an innocent mistake when the debtor either i) lacks knowledge of the undisclosed matter, or ii) has no motive for its concealment."); *In re Barger*, 279 B.R. 900, 905 (Bankr. N.D. Ga. 2002) (finding that "deliberate or intentional manipulation can be inferred from the record and that a debtor's failure to satisfy the statutory duty of disclosure is inadvertent only when in general, the debtor either lacks knowledge of the undisclosed claims or has no motive for their concealment.") (internal quotation omitted)).

***The Testimony and Other Evidence***

During the course of the Evidentiary Hearing, three witnesses were presented by the Debtor. The Debtor testified on his own behalf and presented the testimony of Dr. Max Heinrich, a psychologist who was hired by the City to conduct a psychological examination of the Debtor on

behalf of the City. The Debtor also presented the testimony of Dr. Paul Salkin, a psychiatrist who has been treating the Debtor since the time of the Accident. The City did not call any witnesses.

***The Debtor's Testimony***

The Debtor testified that prior to the Accident he worked at a health care facility with mentally disabled children where he provided physical therapy and taught the children how to write. On the day of the Accident, the Debtor remembered being struck by a police vehicle, the incident that allegedly caused his brain trauma and spending the night in the hospital. After the Accident, he had physical pain in his back, shoulder and knees, the Debtor claims, as well as mental and emotional problems that included depression, suicidal thoughts, an inability to concentrate or read, and impaired memory. The Debtor said that after his release from the hospital, he lived with his mother because he was unable to navigate such mundane tasks as cooking, shopping and handling money. He also developed a stutter after the Accident that made communication difficult, according to the Debtor.

After the Accident, Debtor testified, he was unable to work. He began to have financial problems. He was confused and needed help. The Debtor recalled speaking with a bankruptcy lawyer two or three times about his financial problems, although he could not remember the name of the lawyer, and he recalled paying the attorney's fee, which his mother gave him.

The Debtor testified that when he met with the bankruptcy lawyer he told him that he was involved in an accident, that he had retained a lawyer to handle the Accident case, and that he had testified at a hearing in connection with the Accident. The bankruptcy lawyer never discussed the relationship between the Accident and the bankruptcy filing with him, the Debtor said, nor did he explain that bankruptcy procedure required that a trustee be appointed to administer his assets.

All the Debtor understood about the bankruptcy process, he said, was that it would discharge his outstanding debt. All the necessary documents were completed by his lawyer and filled out by the time he met with him, the Debtor testified. He signed the documents where his lawyer told him to sign, he said, without reading salient parts, including the declaration above his signature that the information provided was true and correct under penalty of perjury.

The Debtor testified that he was unaware that his Accident claim was an asset required to be listed in the bankruptcy filing. He never told his personal injury lawyers about his bankruptcy case, he said, which was corroborated by Gregory J. Cannata, Esq., the Debtor's current personal injury lawyer. Mr. Cannatta stated in his affirmation in support of the Motion to Reopen that he found no reference to the Personal Injury Action in the Debtor's file when he took over the lawsuit, and that the Debtor's bankruptcy filing was first brought to his attention by the City in February 2012 when the City moved to dismiss the Personal Injury Action. The Debtor testified credibly that had he known he was required to list his claim against the City he would have done so because he would have "loved to pay [his creditors] back."

The evidence shows that at the time of the filing of his bankruptcy petition the Debtor was represented by Anthony Rahmanan, who subsequently surrendered his license to practice law in the face of disbarment.[2] The evidence also established that the Debtor has been receiving psychiatric treatment from 1996 to the present time and that at and around the time the Debtor filed for bankruptcy, he was taking a host of psychogenic medications.[3]

---

[2] *See* Debtor's Exh. 2 (Decision of the Supreme Court, Appellate Division, First Judicial Department In the Matter of Anthony Rahmanan, an attorney and counselor-at-law: Departmental Disciplinary Committee for the First Judicial Department, Petitioner, Anthony Rahmanan, Respondent).

[3] Affirmation of Gregory J. Cannata, ¶ 4.

*The Testimony of Dr. Max Heinrich*

Dr. Max Heinrich, a psychologist who did work for the City, was called to testify by the Debtor at the Evidentiary Hearing. He said that he was asked by the City to determine whether the Debtor had any organic brain damage resulting from the accident. The examination took place early in 1997, and Dr. Heinrich submitted a report about the Debtor's condition dated March 20, 1997, to the City.[4]

Dr. Heinrich testified that the Debtor had limited memory at the time of his initial examination. Debtor was unable to recall where he worked, the name of the president, or the day of the week, all suggesting memory impairment. The Debtor was minimally alert, he said, with a markedly impaired attention span and ability to concentrate. The Debtor was unable to follow what Dr. Heinrich was saying and had difficulty in responding to questions. Dr. Heinrich said that the Debtor had difficulty reading even simple words, which he found to be a significant clinical finding. The Debtor's speech was difficult to understand, he added, noting that this was significant because speech is often affected by cerebral damage.

Dr. Heinrich testified that he administered several standard psychological tests and his report indicated that the Debtor manifested bewilderment and perplexity in response to almost all test items. The testing showed that the Debtor had severe impairment of certain aspects of brain functioning, including his sequential thinking, planning ability, short-term memory and verbal memory. The testing also showed that the Debtor was suffering from a serious depressive disorder.

Dr. Heinrich concluded that the Debtor did not have the capacity to be dishonest, because,

---

[4] Debtor's Exh. 3 (Report of Dr. Max. Heinrich dated March 20, 1997).

the Debtor did not have enough cognitive processing ability to do the symbolic planning to mislead anyone. In Dr. Heinrich's opinion, the Debtor would not have been able in 1997 to understand the details of an attorney's explanation of his legal rights, to analyze what the attorney told him, ask probative questions, or read and understand legal forms. The Debtor was "clearly suffer[ing] from a dementia which has uniformly impaired all of his cognitive skills," Dr. Heinrich wrote in his report.[5]

***The Testimony of Dr. Paul Salkin***

Dr. Paul Salkin, the Debtor's treating psychiatrist, was also called to testify at the Evidentiary Hearing regarding the Debtor's mental and emotional condition from June 1996, when he first saw the debtor, to the present. Dr. Salkin noted that he has been treating the Debtor for more than 15 years. He presently sees the Debtor once every four weeks. Reports prepared by Dr. Salkin about the Debtor's condition prepared from 1996-1998 were also admitted into evidence.[6]

Dr. Salkin said that when he first examined the Debtor in June 1996 he was extremely confused and depressed, had suicidal thoughts, experienced trouble sleeping, including nightmares, and was extremely anxious and agitated. The Debtor stuttered badly and was difficult to understand, Dr. Salkin noted, adding that the Debtor's memory was severely impaired, a sign that he was suffering from a cognitive defect stemming from traumatic brain injury. After examining the Debtor several times, Dr. Salkin said he reached three diagnoses as of September

[5]Debtor's Exh. 3 (Report of Dr. Max Heinrich dated March 20, 1997).

[6] Debtor's Exh. 4 (Report of Dr. Paul Salkin dated September 18, 1996); Debtor's Exh. 5 (No Fault Report of Dr. Paul Salkin dated September 18, 1996); Debtor's Exh. 7 (Report of Dr. Paul Salkin dated October 17. 1996); Debtor's Exh. 8 (Report of Dr. Paul Salkin dated November 14, 1996); Debtor's Exh. 11 (Report of Dr. Paul Salkin dated June 30, 1997); Debtor's Exh. 13 (Report of Dr. Paul Salkin dated May 14, 1998).

18, 1996: (1) post traumatic stress disorder; (2) brain trauma with cognitive dysfunction; and (3) depression. At that time, he found that the Debtor's prognosis was poor—his disability was total and he was not likely to recover significantly.

During this initial period of June-September 1996, Dr. Salkin testified, it was his medical opinion that the Debtor was not competent to handle his legal affairs or daily life, and that did not have the capacity in 1996 to devise a plan to defraud his creditors.

In October 1996, Dr. Salkin testified that he made a further finding that the Debtor's disability was total because of the head injury and secondary brain trauma injury. He said that he helped the Debtor to obtain disability benefits by preparing a report dated November 14, 1996 for the New York State Department of Social Services.[6] That contained his diagnoses of the Debtor: cognitive dysfunction and memory loss, loss of concentration, and post traumatic stress disorder with panic and depression. His report indicated that the Debtor was taking antidepressant medication and had an abnormal EEG consistent with a diffuse cerebral dysfunction. Dr. Salkin testified that at the time of the November 14, 1996 report he had no knowledge that the Debtor was proceeding with a bankruptcy case.

Dr. Salkin also testified that he reviewed the March 20, 1997 report of Dr. Max Heinrich and that he agreed with Dr. Heinrich's findings and conclusion that the Debtor suffered from a dementia which uniformly impaired all of his cognitive skills.

In June 1997, Dr. Salkin found that the Debtor's condition had deteriorated. He had become even more seriously depressed that he had been initially, Dr. Salkin said, noting that the

[6] Debtor's Exh. 8 (Report of Dr. Paul Salkin dated November 14, 1996).

Debtor was having auditory hallucinations, that is, voices were telling him to kill himself.[7] This finding caused Dr. Salkin to raise the dosage of the Debtor's antidepressant medication significantly and to recommend that the Debtor be admitted to a psychiatric hospital. The Debtor was subsequently admitted to such a facility on January 31, 1998, and discharged on February 9, 1998.[8]

After his hospital discharge, Dr. Salkin said that the Debtor's condition worsened. By May 1998,[10] there was danger of the Debtor committing suicide due to post traumatic stress disorder with depression and cognitive dysfunction secondary to traumatic brain injury. Again, Dr. Salkin found the Debtor's prognosis to be poor.

All of these findings led Dr. Salkin to conclude that the Debtor at the time the omission from his bankruptcy filing took place, was incapable of acting in bad faith or with fraudulent intent. In order to commit a fraud, Dr. Salkin noted, one would need the mental ability to plan out whatever might be involved in an attempt to defraud. Dr. Salkin testified that in his opinion the Debtor did not have that mental ability during the period 1996-1997 because of his mental confusion and memory difficulties. The Debtor did not have the level of ability to think clearly in order to deceive, Dr. Salkin said.

Dr. Salkin also testified that the Debtor during the period 1996-1997 did not possess the ability to understand his bankruptcy filings. The Debtor would not have been able to comprehend the language of the Statement of Financial Affairs that requires a listing of all suits and

---

[7] Debtor's Exh. 11 (Report of Dr. Paul Salkin dated June 30, 1997).

[8] Debtor's Exh. 12 (Hospital Discharge Summary).

[10] Debtor's Exh. 13 (Report of Dr. Paul Salkin dated May 14, 1998).

proceedings to which the Debtor is or was a party, Dr. Salkin noted, or understand the language of Schedule B which requires a listing of other contingent and unliquidated claims of every nature. The Debtor was not capable of comprehending the nature of the declaration he subscribed to in his bankruptcy filing that his answers were true under penalty of perjury, Dr. Salkin said. Nor did the Debtor have the ability to take exception to legal advice, Dr. Salkin stated, adding that if he was advised by an attorney that he was required to tell the truth with respect to his bankruptcy filings, the Debtor would not have been able to understand the concept. When asked if a chapter 7 trustee had asked the Debtor at that time if he had the right to sue anyone, Dr. Salkin responded that the Debtor would have had difficulty understanding the question, even though he was in the process of suing the City.

Finally, Dr. Salkin testified regarding the Debtor's memory dysfunction from the time of the bankruptcy filing and up to the present. Dr. Salkin said that the Debtor's memory dysfunction in 1996 was severe. In recent months there has been some improvement in the Debtor's ability to remember current events, but the Debtor's memory of past events remains severely impaired.

***Whether the Debtor Had Knowledge of the Claim or Motive to Conceal Assets***

To demonstrate that the failure to disclose the Personal Injury Action was an omission in good faith, the Debtor must show that he either (i) lacked knowledge of the undisclosed matter, or (ii) had no motive for its concealment. *In re Barger*, 279 B.R. 900, 905 (Bankr. N.D. Ga. 2002).

A "[d]ebtor's motive can be implied from what he would gain if he did not have to pay his creditors." *In re Meneses*, No. 05–86811–ast, 2010 WL 813975, at *4 (Bankr. E.D.N.Y. March 3, 2010). Here, the total amount of claims in this case is $8,847.16, less than 1% of the $1 million in damages sought in the Debtor's Personal Injury Action. Even if the Debtor had the mental

capacity to devise a scheme to defraud his creditors, it is unlikely that he would jeopardize such a substantial recovery to keep for himself the minimal amount he owed to his creditors.

The Debtor's failure to disclose the Personal Injury Action is not equivalent to a concealment of it. The Debtor has been treated continuously for traumatic brain injury since the time of the Accident. Both Dr. Heinrich, the City's own expert, and Dr. Salkin, the Debtor's primary physician since 1996, substantiated through credible testimony and documentary evidence that the Debtor has suffered significant and debilitating mental impairment that impedes his capacity to understand legal proceedings or to read and comprehend legal documents.

The Debtor retained bankruptcy counsel to advise him and help him with the bankruptcy proceeding. He was not able to safeguard his legal rights without attorney assistance because of his brain injury. It would be patently unfair under these facts to attribute the bankruptcy attorney's failure to include the Debtor's claims against the City in the bankruptcy filings to the Debtor.

There was no evidence that the Debtor's omission was motivated by bad faith or fraud or that it was in any way an attempt to profit at the expense of the Debtor's creditors. Rather, the testimony shows that while the Debtor knew he had the Accident, he did not understand his obligation to disclose the Personal Injury Action in his bankruptcy filings, and he did not have the capacity to devise a plan to defraud his creditors.

Based upon the uncontroverted evidence, the Court finds that the Debtor has established that his failure to disclose the Personal Injury Action in his bankruptcy filings was inadvertent and an omission made in good faith.

***Benefit to the Debtor***

The benefit to the Debtor of reopening this case is evident. The Debtor alleges that he sustained serious injuries as a result of the Accident. Reopening this case would allow the chapter 7 trustee to appear in the Personal Injury Action as the proper party plaintiff and to continue to pursue the action on the merits. And, if the trustee recovers more than the $8,847.16 in claims and the costs of administration, the Debtor may benefit from any surplus. Thus, benefit to the Debtor favors reopening.

***Prejudice to the City of New York***

There is no doubt that the delay in filing the Motion to Reopen was significant. However, the evidence does not show any prejudicial consequences to the City by the delay. There are no allegations that the delay resulted in loss of evidence or increased difficulties in discovery in the Personal Injury Action. The Personal Injury Action was commenced in the New York state court in 1996, and was not ready for trial until February 2012, some sixteen years later. That delay was the result of the normal process of the New York state court system and would have occurred whether it was the Debtor or a chapter 7 trustee who was prosecuting the lawsuit. Indeed, the City would have had to defend the action regardless of who was prosecuting it.

Moreover, there is no evidence that there was any intent by the Debtor to delay filing this Motion in order to obtain a tactical advantage in the Personal Injury Action. There was no evidence to suggest that the Debtor and his personal injury attorney pursued the Personal Injury Action with knowledge that the action was required to but was not scheduled or administered in this bankruptcy case. The uncontroverted medical testimony showed that the Debtor did not have the capacity to understand that he had a continuing obligation to disclose his claims against the

City in his bankruptcy case. The Debtor similarly did not have the capacity to understand that his bankruptcy case should have been disclosed to his personal injury attorney. The evidence shows that the Debtor's personal injury attorney first became aware of this bankruptcy case when the City moved to dismiss the Personal Injury Action and this Motion to Reopen was filed immediately thereafter.

If this case is reopened, the City will be required to defend the Personal Injury Action on the merits—but that does not amount to legal prejudice. *In re Emmerling*, 223 B.R. at 869. As noted by the *Arana* court: "[I]f this case is not reopened, [the City] may receive a windfall to the extent that the [Personal Injury Action] may well be dismissed based on a technical defense that is far afield from the merits of the claims and defenses." *In re Arana,* 456 B.R. at 177.

Finally, while granting this Motion to Reopen may impact an estoppel defense that may be asserted by the City in the pending Personal Injury Action, this too does not amount to prejudice. *See In re Stein,* 394 B.R. at 18; *In re Phelps*, 329 B.R. 904, 910 (Bankr. M.D. Ga. 2005) (defendants' loss of an estoppel defense requiring them to defend an action on the merits, "is no prejudice at all.").[11]

For these reasons, the Court finds that lack of prejudice to the City favors reopening this

[11] "The doctrine of judicial estoppel prevents a party from asserting a factual position in one legal proceeding that is contrary to a position that it successfully advanced in another proceeding." *Rodal v. Anesthesia Group of Onondaga, P.C.*, 369 F.3d 113, 118 (2d Cir. 2004). As noted by the court in *In re Arana*: "New York state courts have held that judicial estoppel does not apply when a bankruptcy case is reopened under Section 350." *In re Arana*, 456 B.R. at 171, n.1 (citing *Miller v. Berti*, 1 A.D.3d 885, 885-86, 767 N.Y.S.2d 729 (N.Y. App. Div. 4th Dep't 2003); *Koch v. Nat'l Basketball Ass'n*, 245 A.D.2d 230, 231, 666 N.Y.S.2d 630, 631 (N.Y. App. Div. 1st Dep't 1997). This is because "[t]he doctrine of judicial estoppel, which, in a bankruptcy context, bars a party from pursuing claims not listed in a bankruptcy proceeding that resulted in the party's discharge does not apply in the absence of a final determination in the bankruptcy proceeding endorsing the party's inconsistent position concerning his or her assets. [T]he reopening of the bankruptcy proceeding . . . revived the original proceeding and all the procedural and substantive rights of the debtor . . . and thereby nullified the final determination upon which a judicial estoppel could be predicated." *Koch*, 245 A.D.2d at 231, 666 N.Y.S.2d at 631) (internal citations omitted).

bankruptcy case.

***Benefit to Creditors***

Here, the Debtor is not seeking to reopen his case in order to add a creditor or a debt to ensure that the previously omitted debt would be discharged. Rather, the Debtor seeks to add an asset for the benefit of the estate. The Debtor's creditors did not receive a distribution when this case was closed. If this case is reopened to allow the Personal Injury Action to be administered by a trustee, the trustee will provide notice to the creditors and a deadline by which to file proofs of claim. Assuming the trustee recovers on the Personal Injury Action, the creditors, who are owed $8,847.16, will likely receive total payment. "A denial of the [Motion to Reopen] would deprive Debtor's creditors of an opportunity to share in the fruits of any recovery [the trustee] may obtain." *In re Daniel*, 205 B.R. 346, 348 (Bankr. N.D. Ga. 1997).

The City claims that the Debtor's creditors are all institutional creditors who have presumably written off the debts. Therefore, the City argues, it is extremely unlikely that the creditors here will be able or motivated to file proofs of claim. However, as noted by the court in *In re Arana*, "a trustee ought to be given an opportunity to provide notice to creditors, and creditors ought to be given the opportunity to file claims." *Arana*, 456 B.R. at 176. For these reasons, the Court finds that there is no harm to creditors and the potential benefit to creditors weighs in favor of reopening this case

***Limiting Any Monetary Recovery to the Debtor***

During closing argument at the Evidentiary Hearing, the City focused for the first time on remedy and suggested that should the Court grant the Motion to Reopen, the reopening be limited to allow the chapter 7 trustee to pursue the Personal Injury Action and limit any monetary recovery

to the sums needed to pay creditors and the chapter 7 trustee's expenses. "Where a debtor has acted in bad faith or otherwise engaged in inequitable conduct, [the determination as to whether to reopen a bankruptcy case] requires consideration of an appropriate remedy." *In re Arana*, 456 B.R. at 165. As discussed above, the Court finds that there was no motive by the Debtor to conceal the Personal Injury Action and that the Debtor's nondisclosure was inadvertent and made in good faith. Accordingly, there is no need to consider limiting the Motion to Reopen in any manner, including one which limits the monetary award that may result from prosecution of the Personal Injury Action.

## **Conclusion**

The extended lapse of time between the Debtor's Motion to Reopen and the closure of his chapter 7 case demands a compelling reason for this Court to reopen the case. *See In re Lowery*, 398 B.R. at 515. The unique facts here, fully supported by credible testimony and other documentary evidence create a strong foundation for compelling reasons to reopen this bankruptcy case.

There was no evidence of fraud or intentional concealment of the Personal Injury Action by the Debtor or of bad faith on his part. To the contrary, the Debtor's demeanor while testifying and the compelling medical testimony persuaded this Court that the Debtor's omission in disclosing the Personal Injury Action in his bankruptcy filings, albeit for some fifteen years, was attributable to the Debtor's severe mental incapacity and inadequate legal representation at the time of the filing of his bankruptcy case coupled with his lack of capacity to safeguard his legal rights, not from an intentional scheme to defraud his creditors. Moreover, the medical testimony overwhelmingly supports a finding that the Debtor did not have the capacity to understand his

continuing duty of disclosure.

After weighing the factors and considering the Debtor's good faith actions, the Court finds that (i) the creditors would benefit from allowing the Debtor to reopen the case because they never received a distribution but likely would if the chapter 7 trustee prevails in the Personal Injury Action; (ii) the Debtor would benefit from being allowed to reopen his case because he would be able to continue the Personal Injury Action, seek any applicable exemption and receive any funds remaining after a distribution to creditors and payment of the chapter 7 trustee's costs and expenses; and (iii) the City would not be prejudiced beyond the extent to which it would be required to defend the Personal Injury Action on the merits.

Accordingly, the Court finds that the Personal Injury Action is a potentially valuable asset that should be administered for the benefit of creditors. The Debtor's case will be reopened to allow him to amend his bankruptcy filings to include the Personal Injury Action. The chapter 7 trustee shall be re-appointed to administer the Personal Injury Action and the proceeds of that action, if any. A separate order shall be issued forthwith.

**Dated: March 29, 2013**
**Brooklyn, New York**

Nancy Hershey Lord

**Nancy Hershey Lord**
**United States Bankruptcy Judge**

# UNITED STATES BANKRUPTCY COURT
# DISTRICT OF DELAWARE

**CRAIG T. GOLDBLATT**
**JUDGE**

**824 N. MARKET STREET**
**WILMINGTON, DELAWARE**
**(302) 252-3832**

February 1, 2024

**<u>VIA CM/ECF</u>**

Re: *In re Team Systems International, LLC*, No. 22-10066

Dear Counsel:

The Court held a hearing on January 30, 2024, on the trustee's application to retain Chipman Brown Cicero & Cole LLP as general bankruptcy counsel [D.I. 399].[1] After the hearing, the Court indicated that it would grant the motion and proceeded to set forth its reasons on the record. While the Court's explanation might have been clear enough to allow the parties to understand the basis for the Court's decision, in light of the possibility that the ruling may be subject to review, the Court has concluded that it could not in fairness require a reviewing court to make sense of the Court's oral ruling. This letter ruling is accordingly intended to replace the Court's oral observations and provide the basis for the Court's decision to overrule the objection and grant the trustee's application.[2]

This bankruptcy case was filed in January 2022 under chapter 11.[3] The debtor was in the government contracting business. After a multi-day evidentiary hearing on a motion to dismiss the bankruptcy case, the Court converted the case to one under

---

[1] Chipman Brown Cicero & Cole LLP is referred to as "Chipman Brown."

[2] The objecting defendants (as defined below) have separately moved to vacate the Court's January 31, 2024 bench ruling. D.I. 416. This decision to replace the bench ruling with this letter opinion essentially moots any challenge to the bench ruling. The Court believes, however, that the motion to vacate is in fact directed at the order this Court will enter granting the trustee's application. The Court will accordingly treat that order as being the subject of the motion to vacate, and will address that motion after it is fully briefed and before the Court for determination.

[3] D.I. 1.

AUTHENTICATED
U.S. GOVERNMENT
INFORMATION
GPO

chapter 7.[4] George L. Miller was appointed as interim trustee.[5] The Court authorized the trustee to retain Archer & Greiner as bankruptcy counsel under 11 U.S.C. § 327(a).[6]

The motion to dismiss the bankruptcy case was filed by the debtor's two largest creditors, GPDEV, LLC and Simons Exploration, Inc., both of which held judgments against the debtor relating to goods and services they provided to the debtor in connection with a government contract.[7] Those creditors' efforts to enforce their judgments are what led the debtor to file this bankruptcy case. After the case was converted to chapter 7, those creditors sought, at the § 341 meeting, to elect a chapter 7 trustee who would replace Miller and become the case trustee. After an evidentiary hearing, the Court concluded that while those judgment creditors were in fact entitled to elect a trustee, the trustee they selected was not eligible to serve under § 321 of the Bankruptcy Code. As a result, their effort to elect a trustee was unsuccessful and Miller remained in place as the case trustee.[8]

The bankruptcy case has been active and highly contentious. A large part of the reason for that has been an adversary proceeding that the trustee filed against the owners of the debtor, seeking the recovery of millions of dollars of transfers that the trustee alleges that the debtor made to the defendants in the period prior to the bankruptcy filing.[9]

There are other disputes, too. The objecting defendants take issue with what they describe as the trustee's failure to pursue estate receivables from the federal government that they contend would be sufficient, if recovered, to render the estate solvent and thereby obviate the fraudulent conveyance lawsuit. The trustee faults the objecting defendants for failure to cooperate sufficiently with his efforts to pursue those alleged receivables. At one point, the objecting defendants filed a motion seeking standing to act on behalf of the bankruptcy estate (in lieu of the chapter 7 trustee) to file claims and seek to recover on part of the alleged government receivable.[10] The trustee then filed a Rule 11 motion against the objecting

---

[4] D.I. 151.

[5] D.I. 152.

[6] D.I. 173.

[7] Those creditors are referred to as the "judgment creditors."

[8] *See* D.I. 228.

[9] *See Miller v. Mott, et al.*, Adv. Proc. No. 23-50004-CTG (Bankr. D. Del.). Certain of the defendants are the parties objecting to the retention of Chipman Brown. Those parties are referred to as the "objecting defendants."

[10] D.I. 328.

defendants, contending that there is no competent evidence supporting the alleged receivable and that counsel for the objecting defendants failed to conduct reasonable diligence before filing the standing motion. And while the objecting defendants have since withdrawn the standing motion, the parties remain in discovery with respect to the trustee's Rule 11 motion.[11]

One additional aspect of this case's procedural history is also relevant to the current motion. After the judgment creditors, Bering Straits Logistics Services, LLC is the debtor's next largest creditor.[12] While Bering Straits has not been particularly active in the bankruptcy case, it did participate (incidentally) in the hearing on the motion to dismiss, as well as the hearing on the contested trustee election. Bering Straits' lead counsel has been Cabot Christianson, P.C., an Alaska-based law firm. Chipman Brown had served as Bering Straits' Delaware counsel.

In November 2023, David W. Carickhoff and Bryan J. Hall, the two lawyers from Archer & Greiner who were most actively involved in the representation of the chapter 7 trustee, moved to Chipman Brown, thus precipitating the trustee's motion to retain Chipman Brown. Before Carickhoff and Hall joined Chipman Brown, Bering Straits consented to the substitution of Potter Anderson & Corroon LLP as its Delaware counsel, and the chapter 7 trustee agreed to engage separate counsel if he wished to proceed against Bering Straits.[13]

The objecting defendants object to the motion, claiming that Chipman Brown's prior representation of Bering Straits precludes it from serving as general bankruptcy counsel to the chapter 7 trustee.

## Analysis

### I. The objecting defendants lack standing to object to the retention under 11 U.S.C. § 327(c).

The Court begins with the presumption that the objecting defendants, who hold equity in the debtor, are parties-in-interest in the bankruptcy case and have standing to appear and be heard on any dispute that might affect the value of their equity interests in the debtor. But even accepting the broadest possible view of standing as a general matter, a provision of the Bankruptcy Code, 11 U.S.C. § 327(c),

[11] *See* D.I. 385.

[12] Bering Straits Logistics Services, LLC is referred to as "Bering Straits."

[13] D.I. 399-1 at 2 (Hall Declaration).

addresses who may object to the retention of counsel on account of that counsel's representation of a creditor. It provides:

> In a case under chapter 7, 12, or 11 of this title, a person is not disqualified for employment under this section solely because of such person's employment by or representation of a creditor, unless there is objection by another creditor or the United States trustee, in which case the court shall disapprove such employment if there is an actual conflict of interest.[14]

This language expressly and unambiguously limits standing to object to a retention in these circumstances to other creditors or the United States trustee. The objecting defendants are neither. They hold equity in the debtor but are not creditors. They therefore lack standing to raise this objection.

The objecting defendants respond to that argument by taking issue with the assertion that they are not creditors. Their basis for creditor status is 11 U.S.C § 502(h), which provides that "[a] claim arising from the recovery of property under section ... 550 ... of this title shall be determined, and shall be allowed ... or disallowed ... the same as if such claim had arisen before the date of the filing of the petition."[15]

Because the objecting defendants are being sued for a fraudulent conveyance, with the trustee's claim to recover the allegedly fraudulent conveyance arising under § 550, the objecting defendants assert that § 502(h) renders them creditors. But that is wrong. Section 502(h) does not *create* a claim, it merely addresses *when* a claim that might come into being as a result of the trustee's recovery of property would arise. The provision states that if one holds a claim that arises from the recovery of property under § 550, the claim is treated as a prepetition claim.

There are contexts in which this provision does important work. Consider a vendor that was owed $1,000 for goods or services provided before the bankruptcy and received payment in full on that claim in the 90-day period before the bankruptcy filing. The prepetition payment effectively allowed that creditor to be paid in full on its claim, while other general unsecured creditors would receive whatever *pro rata* distribution was available to similarly situated creditors. For our purposes, let's assume that is $.30 on the dollar.

---

[14] 11 U.S.C. § 327(c).

[15] 11 U.S.C. § 502(h).

Under 11 U.S.C. § 547, the trustee may be able to avoid the $1,000 payment as preferential and recover the $1,000 from the vendor. But if the trustee in bankruptcy can recover $1,000 from the vendor, then the vendor is *worse* off than it would have been had it not received the prepetition payment, in which case it would have come into bankruptcy holding a $1,000 claim on which it would have received a *pro rata* distribution of $300. Section 502(h) solves that problem. It allows the preference defendant who repays the $1,000 to assert a prepetition claim for $1,000, and thus receive whatever *pro rata* distribution other similarly situated creditors are receiving.

Section 502(h) may also have some application in a fraudulent conveyance case. Consider a customer of the debtor who (without any knowledge of the debtor's fraudulent intent) buys a widget from the debtor for $100 that was actually worth $1,000. Because the customer did not pay reasonably equivalent value, the transfer of the widget may be avoidable by the trustee in bankruptcy under 11 U.S.C. § 548. In that case, § 548(c) gives the customer a lien on the widget to the extent of the value it paid, here, $100. Section 502(h) thus allows the customer, after returning the widget, to assert its secured claim.

The objecting defendants argue that because they are being sued under § 550, they are creditors holding contingent claims under § 502(h). And the objecting creditors are right in their suggestion that the fact that all of this is contingent on what might happen the adversary proceeding does not matter. The Bankruptcy Code's definition of claim is extremely broad and expressly includes "contingent" claims.[16]

That is all fine and good. But in order to have standing, the objecting defendants must still describe some set of circumstances in which they might end up holding a claim. They are being sued for fraudulent conveyance, not a preference, so they are unlike the vendor whose prepetition claim against the debtor would be restored when it repays the preferential payment it received. And unlike the widget-buyer in the fraudulent conveyance example, there is no allegation or suggestion that the objecting defendants paid anything in exchange for the prepetition transfers the debtor made to them. Their position throughout the bankruptcy case has been that the alleged transfers were tantamount to dividends of profits that a solvent corporation might make to its shareholders on account of their ownership of the company. The objecting defendants (despite being given every opportunity to offer a theory) have made no suggestion that there is any circumstance in which they would hold a claim against the debtor. As such, they are not creditors. Under the plain

---

[16] *See* 11 U.S.C. § 101(5).

language of § 327(c), they may not object to the trustee's motion to retain Chipman Brown.

## II. Even if the objecting defendants had standing, their objection to the application would nevertheless be overruled because it lacks merit.

In the alternative, however, the Court has little trouble finding Chipman Brown to satisfy the requirements of § 327(a) of the Bankruptcy Code. Section 327(a) provides that the "trustee, with the court's approval, may employ one or more attorneys, accountants, appraisers, auctioneers, or other professional persons, that do not hold or represent an interest adverse to the estate, and that are disinterested persons, to represent or assist the trustee in carrying out the trustee's duties under this title."

In *In re Marvel Entertainment Group*, the Third Circuit described the standard under § 327(a) as one that depends on which of three categories is applicable:

> (1) Section 327(a), as well as § 327(c), imposes a per se disqualification as trustee's counsel of any attorney who has an actual conflict of interest; (2) the district court may within its discretion—pursuant to § 327(a) and consistent with § 327(c)—disqualify an attorney who has a potential conflict of interest and (3) the district court may not disqualify an attorney on the appearance of conflict alone.[17]

The Court is satisfied that Chipman Brown has no "actual conflict" that precludes its representation of the trustee. Bering Straits is a former rather than a present client of the firm's. And Bering Straits, which has the same lead counsel it has had throughout the case and new Delaware counsel, has not objected to the retention in any way.

At most, any conflict is "potential." And under *Marvel*, in the case of a "potential" conflict, the bankruptcy court has discretion to approve or disapprove the retention, based on the court's assessment of the totality of the circumstances. The objecting defendants contend that Bering Straits has some connection to the trustee's Rule 11 motion and that one or more lawyers at Chipman Brown may end up as witnesses in connection with that motion. And the objecting defendants further argue

---

[17] 140 F.3d 463, 476 (3d Cir. 1998). The objecting defendants urge the Court to apply the standard adopted by the Bankruptcy Court for the Northern District of Illinois in *In re Envirodyne Indust., Inc.*, 150 B.R. 1009 (Bankr. N.D. Ill. 1993). While the facts of *Envirodyne* are materially different from those here (the creditor in that case remained a client of the firm whose retention was at issue) such that it by no means clear that application of *Envirodyne*'s standard would lead to a different outcome in this case, this Court nevertheless believes it more appropriate to apply the principles set forth by the Third Circuit in *Marvel*.

that the trustee will be required to retain conflicts counsel to deal with any possible objection to the Bering Straits proof of claim.[18]

This Court's assessment, based on its experience in having presided over this highly contentious bankruptcy case for more than two years, is that whatever disputes the estate may have with Bering Straits are of relatively minor importance in the scheme of this bankruptcy case. And even if an attorney from Chipman Brown were to be called as a witness in the Rule 11 Motion, that possibility would not bar other attorneys from Chipman Brown from continuing as counsel to the trustee. Nonetheless, the objecting defendants have made no persuasive argument that such testimony will be relevant to the Rule 11 dispute.

In sum, on the totality of the record and based on the extensive knowledge that the attorneys now at Chipman Brown have obtained over the course of this very contentious bankruptcy case, the Court does not believe that the circumstances identified by the objecting defendants provide a sufficient basis to deny the trustee's application. The application will therefore be granted, and a separate order will be entered.

Sincerely,

Craig T. Goldblatt
United States Bankruptcy Judge

---

[18] That proof of claim was objected to immediately before the § 341 meeting. The objection was withdrawn without prejudice in December 2023. *See* D.I. 398.

**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

---

No. 24-3365

---

In re: TEAM SYSTEMS INTERNATIONAL, LLC,
Debtor

STEVEN M. ACOSTA; JOHN S. MACIOROWSKI; CHRISTOPHER MOTT;
DEBORAH EVANS MOTT,
Appellants

v.

GEORGE L. MILLER, in his capacity as Chapter 7 Trustee for the bankruptcy estate of
Team Systems International, LLC

---

On Appeal from the United States District Court
for the District of Delaware
(D.C. No. 1:23-cv-01038)
District Judge: Honorable Gregory B. Williams

---

Submitted Pursuant to Third Circuit L.A.R. 34.1(a)
November 4, 2025

---

Before: KRAUSE, PHIPPS, and ROTH, *Circuit Judges*

(Filed: March 26, 2026)

---

OPINION*

---

* This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not constitute binding precedent.

PHIPPS, *Circuit Judge*.

During the pendency of an appeal of judgments against it, a limited liability company filed for bankruptcy. On behalf of the LLC, the bankruptcy trustee negotiated a settlement that was approximately ten percent less than the appealed judgments. But that favorable discount was not enough for the members of the LLC, who were hoping to recover some of their equity interests in the LLC, so they objected to the proposed settlement on the ground that it was still too high. The Bankruptcy Court evaluated the proposed settlement, determined that it was reasonable, and approved it. The LLC's members appealed that order to the District Court, which affirmed the Bankruptcy Court's ruling. The members now appeal that decision. For the reasons below, we will affirm the judgment of the District Court.

## BACKGROUND

In June 2017, the Federal Emergency Management Agency published a request for proposals for the provision of bottled water. In response to that full and open competition, Team Systems International, a Delaware limited liability company with four members,[1] submitted a proposal and was awarded a five-year contract. To meet the demands of the contract, TSI entered into a consulting agreement with two other entities, GPDEV, LLC, and Simons Exploration, Inc., d/b/a Archangel International, referred to herein as 'the consultants,' to find suppliers of bottled water. The consultants identified one supplier, Niagara Bottling, LLC, and TSI promised the consultants 25% of the net income realized from the bottled water supplied by Niagara.

[1] Those members were "Deborah Evans Mott; her son, Christopher Mott; her husband, John Maciorowski; and Steven Acosta." *In re Team Sys. Int'l, LLC*, 640 B.R. 296, 302 (Bankr. D. Del. 2022).

Shortly after TSI was awarded the FEMA contract, Hurricane Maria hit Puerto Rico, and the needed bottled water exceeded Niagara Bottling's capacity. The consultants then found another supplier, Nestle Waters, for about half of the needed bottled water. In calculating the compensation due the consultants, however, TSI included only the net income from the water supplied by Niagara Bottling – not the net income from the water provided by Nestle.

The consultants sued TSI in federal court in Florida for the shortfall in their compensation from the net income for the Nestle-supplied bottled water. *See GPDEV, LLC v. Team Sys. Int'l, LLC*, 2021 WL 5035029, at *1 (N.D. Fla. Sept. 28, 2021). In August 2021, the case went to trial, and in response to special interrogatories, the jury determined that TSI's net income from the FEMA contract was about $25 million and that the consulting agreement had been modified so that it applied not only to water supplied by Niagara Bottling but also to water supplied by Nestle. *Id.* at *2. Consistent with those findings, the jury awarded around $6.2 million inclusive of nearly $1 million in prejudgment interest to the consultants. *Id.* TSI appealed those judgments to the Eleventh Circuit.

On January 18, 2022, while that appeal was pending and after TSI's opening brief was filed but before any additional briefing or oral argument, TSI filed for Chapter 11 bankruptcy in Delaware. *See In re Team Sys. Int'l, LLC*, 640 B.R. 296, 305 (Bankr. D. Del. 2022). That filing automatically stayed the Eleventh Circuit appeal. *See* 11 U.S.C. § 362(a)(1).

In response to a request by one of TSI's creditors, the bankruptcy was converted to a Chapter 7 liquidation. *In re Team Sys. Int'l, LLC*, 640 B.R. at 301, 322. *See generally* 11 U.S.C. § 1112(b). As a result of that conversion, a bankruptcy trustee was empowered

– in lieu of TSI's members – to manage and resolve the claims against TSI. *See generally* 11 U.S.C. § 704(a). The consultants filed claims against TSI for the full amount of the judgments they obtained in addition to post-judgment interest.

In exercising his duties, the trustee preliminarily objected to the consultants' claims. But after reviewing TSI's pending but stayed Eleventh Circuit appeal, the trustee was able to negotiate a settlement with the consultants. Under that proposed agreement, the consultants would reduce their claims by about $600,000, to a total of $5.6 million. In return, TSI would allow a general unsecured claim for the consultants in that amount and the parties would work to dismiss the appeal.

The trustee filed a motion to approve that settlement. *See* Fed. R. Bankr. P. 9019(a). TSI's members objected because they believed that TSI was likely to succeed on its Eleventh Circuit appeal, and if it did, then they further believed that the consultants would not win their breach-of-contract case and the value of the estate would increase by the full value of the judgments against it, not merely $600,000. After holding a hearing on this issue, the Bankruptcy Court approved the settlement as a reasonable exercise of the trustee's judgment.

TSI's members appealed that ruling to the District Court, *see* 28 U.S.C. § 158(a)(1), which affirmed the Bankruptcy Court's order on two grounds, *In re Team Sys. Int'l, LLC*, 2024 WL 5008854, at *3–5 (D. Del. Dec. 6, 2024). First, it held that TSI's members – though parties in interest under the applicable statute, *see* 11 U.S.C. § 1109(b), and thus able to object to the settlement in the Bankruptcy Court – nonetheless lacked a form of prudential standing, which may be referred to as 'bankruptcy appellate standing,' to appeal the Bankruptcy Court's approval of the settlement. *See In re Team Sys. Int'l*, 2024 WL 5008854, at *3–4. Second, the District Court determined that the Bankruptcy Court's

approval of the settlement was reasonable. *Id.* at *5–11 (identifying the settlement as being supported by the applicable legal considerations, namely "(1) the probability of success in litigation; (2) the likely difficulties in collection; (3) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and (4) the paramount interest of the creditors" (quoting *In re Martin*, 91 F.3d 389, 393 (3d Cir. 1996))).

Through a timely notice of appeal, TSI's members invoked this Court's appellate jurisdiction to challenge that final decision. *See* 28 U.S.C. § 1291; Fed. R. App. P. 4(a)(1)(A). In addition to several other challenges,[2] TSI's members attack the District Court's threshold basis for denying their appeal: its conclusion that they lacked bankruptcy appellate standing.

## DISCUSSION

As a baseline, there is no question that in the Bankruptcy Court, TSI's members could challenge the trustee's proposed settlement of the Eleventh Circuit appeal. Under the Bankruptcy Code, "[a] party in interest, including . . . an equity security holder[] . . . may raise and may appear and be heard on any issue in a case under this chapter." 11 U.S.C. § 1109(b); *see also In re PWS Holding Corp.*, 228 F.3d 224, 248–49 (3d Cir. 2000) (characterizing the party-in-interest requirement as "confer[ring] broad standing"). And on account of their equity interests in the estate, the members were 'parties in interest' who could challenge the trustee's proposed settlement of TSI's Eleventh Circuit appeal.

[2] Some of those arguments are grounded in procedural concerns, such as the denial of discovery requests and alleged coercion by the trustee in breach of his fiduciary duties. Others raise collateral challenges to the judgments on appeal to the Eleventh Circuit by arguing that those judgments illegitimately authorized an illegal contract under federal law, improperly modified a contract through parol evidence, and were void for a lack of diversity jurisdiction.

In appealing the Bankruptcy Court's approval of that settlement to the District Court, TSI's members had to establish their Article III standing. *See Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (explaining that Article III standing "limits the category of litigants empowered to maintain a lawsuit in federal court to seek redress for a legal wrong"). Under the modern tripartite test, a party may demonstrate Article III standing through proof appropriate to the stage of the case of (i) an injury-in-fact that is concrete, particularized, and actual or imminent; (ii) fairly traceable causation between the challenged act and the injury-in-fact; and (iii) redressability, meaning that the injury-in-fact "is capable of resolution in a manner consistent with the traditional understanding of the judicial process." *Lutter v. JNESO*, 86 F.4th 111, 124, 128 (3d Cir. 2023). TSI's members meet that test. They assert that the settlement agreement decreases the value of their equity interests, which suffices for a concrete, particularized, and actual injury-in-fact. The other two elements are satisfied as well because that injury-in-fact is fairly traceable to the Bankruptcy Court's approval of the settlement, and a vacatur of the Bankruptcy Court's ruling on appeal would redress the injury-in-fact.

In addition to the party-in-interest requirement for bankruptcy court and the Article III standing requirement to proceed in Article III courts, a party seeking to appeal a ruling from a bankruptcy court must make one more threshold showing: bankruptcy appellate standing. To meet that standard, a person's "rights or interests" must be "'directly and adversely affected pecuniarily' by an order of the bankruptcy court." *In re PWS*, 228 F.3d at 249 (quoting *In re Dykes*, 10 F.3d 184, 187 (3d Cir. 1993)). Although this requirement is a prudential "judge-made doctrine[]" as opposed to being derived from Article III or any extant statute, *Potter v. Cozen & O'Connor*, 46 F.4th 148, 154 (3d Cir.

2022),[3] it is "more restrictive" than both the other threshold showings because "in the absence of such a stringent standing rule, collateral appeals could proliferate and unduly slow the emergence of the filer from the proceedings," *In re Imerys Talc Am., Inc.*, 38 F.4th 361, 371 (3d Cir. 2022). So while a decrease in valuation of their equity interests suffices for an injury-in-fact for purposes of TSI's members' Article III standing, to have bankruptcy appellate standing, they must demonstrate that they will leave the bankruptcy proceeding with less money as a result of the Bankruptcy Court's order approving the settlement agreement.[4]

The District Court concluded that TSI's members had not made that showing. On clear-error review of any factual findings regarding the determination that TSI's members lacked bankruptcy appellate standing, *see In re Dykes*, 10 F.3d at 185, 188, there is no definite and firm conviction that the District Court erred in finding a lack of bankruptcy appellate standing. Even putting aside the foundational uncertainty of whether any money

---

[3] Bankruptcy appellate standing has not always been prudential. It was originally developed as a form of statutory standing based on the phrase 'person aggrieved,' which was used in an earlier version of the Bankruptcy Code, *see* 11 U.S.C. § 67(c) (1976). *See generally In re U.S. Overseas Airlines, Inc.*, 419 F.2d 932, 933 (3d Cir. 1969) (per curiam) (developing bankruptcy appellate standing based on the term 'person aggrieved'). But even after the statutory provision containing that phrase was repealed by the Bankruptcy Reform Act of 1978, courts continued to give effect to bankruptcy standing as a prudential principle. And although the Supreme Court in *Susan B. Anthony List v. Driehaus*, 573 U.S. 149 (2014), questioned the doctrine of prudential standing as in tension with the "virtually unflagging" obligation of federal courts to hear and decide cases within their jurisdiction, *id.* at 167, TSI's members have not argued for the abrogation of bankruptcy appellate standing, *cf. In re Imerys Talc Am., Inc.*, 38 F.4th 361, 371 (3d Cir. 2022) (clarifying that bankruptcy appellate standing, also referred to as "the 'person aggrieved' standard . . . remains good law"). *But cf. Matter of E. Coast Foods, Inc.*, 80 F.4th 901, 906 (9th Cir. 2023) (questioning why courts have "continued to apply the person aggrieved rule in the absence of the statute providing the basis for doing so"), *cert. denied sub nom. Clifton Cap. Grp., LLC v. Sharp*, 144 S. Ct. 1064 (2024).

[4] As a prudential principle designed to facilitate the administration of bankruptcy proceedings, bankruptcy appellate standing may be more readily satisfied by the debtor and higher-order creditors as well as by creditors or even equity holders whose interests are adjudicated closer in time to the close of the bankruptcy proceeding.

will be left for equity holders, TSI's members have not shown that any ultimate pecuniary recovery will be greater without the settlement. That may be the case. But if the Eleventh Circuit were to affirm the judgments against TSI, then the members' potential recovery would be reduced by the $600,000 discount secured through the settlement. With that uncertainty as to whether the approval or rejection of the settlement will yield a greater recovery for TSI's members, their interest is "too contingent" for bankruptcy appellate standing. *Travelers Ins. Co. v. H.K. Porter Co.*, 45 F.3d 737, 742 (3d Cir. 1995).[5]

## CONCLUSION

For the foregoing reasons, we will affirm the District Court's judgment.

[5] TSI's members also allude to potential exposure to criminal penalties, *see, e.g.*, 18 U.S.C. § 287, or contractual clawbacks under the False Claims Act, *see* 31 U.S.C. § 3729(a), as a basis for bankruptcy appellate standing. But those concerns are even further removed from the bankruptcy proceeding than the trustee's settlement decision, and those do not constitute the direct and adverse pecuniary effects needed for bankruptcy appellate standing.