IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE: | : | CHAPTER 11 |
| | : | |
| LUXURY TIME GLOBAL, LLC | : | CASE NO. 5:25-bk-00912-MJC |
| | : | |
| DEBTOR | : | |

**UNITED STATES TRUSTEE'S MOTION**
**FOR CONVERSION OR DISMISSAL**

Andrew R. Vara, United States Trustee for Regions 3 and 9 ("U.S. Trustee"), moves this Court pursuant to 11 U.S.C. § 1112(b)(1) to either convert the Debtor Luxury Time Global, LLC's ("Debtor") case to a liquidation case under chapter 7 or, in the alternative, to dismiss the chapter 11 reorganization proceedings.

In support of his motion, the U.S. Trustee states as follows:

**Background**

1. The U.S. Trustee has supervisory jurisdiction over this case pursuant to 11 U.S.C. § 307 and 28 U.S.C. § 586(a)(3).

2. On April 2, 2025, Luxury Time Global, LLC ("Debtor") filed a voluntary petition as a Subchapter V debtor-in-possession under Chapter 11 of the Bankruptcy Code [Document Number[1] 1]. According to the Debtor's petition, the Debtor is a small business debtor as defined in 11 U.S.C. § 101(51D). The Debtor elected to proceed under subchapter V of chapter 11.

3. In response to the Court's Notice of Incomplete and/or Deficient Filing dated April 3, 2025 [Doc No. 4], on April 14, 2025, Debtor filed an Application for Extension of Time for Filing of Schedules and Statements [Doc. No. 13], which the Court granted on April 22, 2025

[1] Hereinafter "Doc. No."

[Doc. No. 21], extending the filing deadline to May 6, 2025. On May 2, 2025, Debtor timely filed its Schedules and Statements [Doc. No. 25].

4. The U.S. Trustee appointed Jill E. Durkin as subchapter V chapter 11 trustee ("Trustee") on April 3, 2025 [Doc. No. 5].

5. On April 14, 2024, the U.S. Trustee reviewed and explained the obligations and reporting requirements of all debtors under 11 U.S.C. § 1106(a)(1), which incorporates 11 U.S.C. § 704(a)(8), with the Debtor and its proposed general bankruptcy counsel as part of the U.S. Trustee's Initial Debtor Interview ("IDI").

6. On May 6, 2025, the U.S. Trustee commenced Debtor's telephonic § 341(a) Meeting of Creditors as scheduled [Doc. No. 16] but due to exigent circumstances, was unable to complete the examination, leading to the adjournment of the § 341(a) Meeting to May 13, 2025 at 9:00 a.m. [Doc. No. 26] when it was completed (collectively "341a Meeting") following a detailed examination of the Debtor through its sole and Managing Member, Eric David Bartels ("Mr. Bartels").

7. While the Debtor has filed its first Monthly Operating Report [Doc. No. 40], its contents are both incomplete and fundamentally flawed. For example, while the Debtor states that in April 2025 it did not have any bank accounts open other than the DIP accounts (Question 10), the U.S. Trustee notes that the earliest transactions shown on the Axos Bank statement for account ending in 8417, apparently Debtor's sole Debtor-in-Possession account ("DIP account"), are dated April 29-30, 2025, a full 27-28 days after the April 2, 2025 case commencement date. This circumstance, combined with Mr. Bartels' § 341(a) testimony that Debtor has continued to do business after filing for bankruptcy, strongly suggests that Debtor utilized one or more of its

pre-petition bank accounts during the interim period[2], but has nevertheless failed to produce copies of those subject bank accounts. Moreover, Debtor has chosen to decline to give any response to Question 11 regarding whether it has sold any assets other than inventory, and given the non-sequitur response of "N/A" to depositing all of its receipts for the business into its DIP account. Finally, contrary to Mr. Bartels' § 341(a) testimony, Debtor perhaps falsely affirms that it has timely filed its 2024 tax return and paid its tax liability (Question 6).

8. The Debtor has not yet filed a proposed plan of reorganization. Given the case commencement date of April 2, 2025, 11 U.S.C. § 1189 requires the plan to be filed no later than July 1, 2025.

9. Mr. Bartels is the "Managing Agent" and 100% shareholder of the Debtor. *See* Debtor's Statement of Financial Affairs (Doc. No. 25, part 13, item 28). Mr. Bartels appears to act as the Debtor's sole principal, having signed the petition and schedules, as the "Managing Agent" of the Debtor.

10. As described in the Debtor's bankruptcy schedules and Mr. Bartels' § 341(a) testimony, given an overall lack of tangible assets, the primary source of Debtor's value is its own operations as a high-end luxury watch wholesaler with retail sales to the general public, reportedly generating gross sales revenue of several millions of dollars annually since its formation in or about October 2021. Mr. Bartels' testimony indicated that each watch sold by the Debtor costs "upwards of $30, $40, $50 thousand or more apiece."

11. Mr. Bartels is identified on Schedule H as the sole personal guarantor of the Debtor's non-priority unsecured obligations totaling $411,480.00 to eleven (11) separate

[2]Notably, the second entry on the Axos Bank DIP account is a $13,200 "Wire Transfer Credit" from the Debtor itself, presumably from a non-DIP account, on April 30, 2025.

"Merchant cash advance" ("MCA") lenders, all obtained between September 2024 and March 2025.

12. During his § 341(a) testimony, Mr. Bartels attributed the Debtor's need to file the instant bankruptcy case to the monthslong failure of "Restivo,"[3] a supplier/vendor in Italy to deliver numerous luxury watches reportedly ordered and paid for by the Debtor and the resulting dip in Debtor's cashflow. While the timeline associated with these events morphed during Mr. Bartels' § 341(a) testimony, he testified that these circumstances were what triggered the Debtor's decision to begin borrowing from the MCA lenders in August 2024. Mr. Bartels' § 341(a) testimony cited the "aggressive" collection methods of the MCA lenders, including daily or weekly ACH payments from the Debtor's checking account, as the cause of Debtor's complete liquidation of its existing inventory of luxury watches in or about October 2024.

Usage of Debtor's Bank Accounts and Mr. Bartels' Pre-petition Compensation

13. At Part 13, Item 30 on Debtor's Statement of Financial Affairs describes transfers out of Debtor's business checking and savings accounts to Mr. Bartels' personal checking and savings accounts during the one-year period of January 1, 2024 to December 31, 2024[4] totaling $3,348,865.05 as well as transfers into Debtor's business checking and savings accounts from Mr. Bartels' personal checking and savings accounts totaling $2,817,721.50 during that same one-year period. Notably, the net difference of $531,143.55 remaining in Mr. Bartels' personal accounts at the end of calendar year 2024 is described on Debtor's Statement of Financial Affairs

[3]Mr. Bartels also testified that Restivo is associated with a domestic wholesaler called "Star Watches, Ltd."

[4]Mr. Bartels testified at the 341a Meeting that the reference in item 30 to "December 31, 2025" is a typographical error, intended to demarcate the one-year period of January 1 through December 31, 2024.

as Mr. Bartels' "Employee compensation"— a characterization he affirmed during his 341a Meeting testimony.

14. Further, according to his testimony at the 341a Meeting, Mr. Bartels has sole and exclusive access to Debtor's bank accounts, pre-petition and post-petition, for all transactions. In connection with the IDI and 341a Meeting, the U.S. Trustee requested and obtained copies of Debtor's checking and savings accounts at Wells Fargo Bank for the months directly leading up to the filing of this case. In particular, while the Debtor, through proposed Counsel Gurdin, has not yet fully complied with copies of all of the bank statements requested by the U.S. Trustee covering numerous account-to-account transfers to and from Debtor's Wells Fargo accounts during this pre-petition period, the U.S. Trustee has analyzed activity in Debtor's said Wells Fargo accounts ("Bank Analysis") from August 2024 to and including March 2025, the 8-month period leading up to the April 2, 2025 case commencement.

15. As evidenced by the underlying bank statements, in each and every month from August 2024 to March 2025, Mr. Bartels engaged in numerous and repeated online gambling transactions, betting amounts varying from a thousand dollars to tens of thousands of dollars in wagers from Debtor's business checking account at Windcreek-PA online casino, BetRivers, Sugar House online casino, Bet365, Caesars Sports, Fanduel, and Jackpot City online casino.

16. As demonstrated by the U.S. Trustee's detailed Bank Analysis, summarized in the table below, when coupled with the deposits apparently stemming from his winning wagers during this 8-month time period, Mr. Bartels' gambling activities **funded by the Debtor** resulted in a net loss for each of those 8 months, with **a combined net loss of $(1,400,263.39)**:

///

///

**Mr. Bartels' Gambling Transactions**:

| | | |
|---|---|---|
| Acct x9319 August 2024 – | 4 Gambling deposits | $17,700 |
| | 65 Gambling withdrawals | $394,900 |
| | **Net withdrawal** | **($377,200)** |
| Acct x9319 September 2024 - | Zero (0) Gambling deposits | |
| | 52 Gambling withdrawals | **($469,400)** |
| Acct x4740 October 2024[5] – | Zero (0) Gambling deposits | |
| | 2 Gambling withdrawals | **($18,500)** |
| Acct x4740 November 2024 – | 43 Gambling deposits | $93,676 |
| | 20 Gambling withdrawals | $212,900 |
| | **Net withdrawal** | **($119,224)** |
| Acct x4740 December 2024 – | 36 Gambling deposits | $162,836.61 |
| | 24 Gambling withdrawals | $239,300 |
| | **Net withdrawal** | **($76,463.39)** |
| Acct x4740 January 2025 – | 4 Gambling deposits | $23,447 |
| | 5 Gambling withdrawals | $52,200 |
| | **Net withdrawal** | **($28,753)** |
| Acct x4757 February 2025 – | One (1) Gambling deposit | $5,010 |
| Acct x4740 February 2025 -- | 27 Gambling withdrawals | $223,200 |
| | **Net withdrawal** | **($218,190)** |
| Acct x4740 March 2025 – | 2 Gambling deposits | $4,692 |
| | 13 Gambling withdrawals | $97,225 |
| | **Net withdrawal** | **($92,533)** |

17. When asked to characterize his gambling losses borne by the Debtor's funds, Mr. Bartels stated that those monies should also be treated as his "compensation." Therefore, in sum,[6] during a period of declining gross revenue and an inability to deliver promised product to

[5]Debtor closed its Wells Fargo business checking account ending in 9319 as of September 30, 2024, reportedly due to "fraud" by one or more of the MCA lenders according to Mr. Bartels' § 341(a) testimony and conducted its business solely out of its business savings account until a replacement business checking account ending in 4740 was opened on October 30, 2024 by the Debtor. Thus, this entry covers only the 2 day period October 30-31, 2024.

[6]While not included in this total, the U.S. Trustee notes that dozens of entries on Debtor's

its customers, in the 8 months immediately preceding the filing of this bankruptcy case, Mr. Bartels nevertheless caused the Debtor to pay him **"compensation" of at least $1,931,406.94** ($531,143.55 + $ 1,400,263.39), largely by funding Mr. Bartels' personal gambling activities.

18. In addition, during that same 8-month time frame, Mr. Bartels repeatedly transferred substantial amounts between Debtor's bank accounts (ending in 9319, 4740 and 4757) and Mr. Bartels' various personal checking (ending in 9620 and 2425) and savings accounts (ending in 5435, 0091 and 4072), as well as to himself via Zelle or his CashApp. When asked to explain during the 341(a) Meeting, Mr. Bartels testified that he did this to "protect deposits" made by Debtor's customers from being subject to the ACH transfers of the MCA lenders out of Debtor's checking account and to earn interest upon said funds before they were used to purchase the customers' watch orders.

19. As demonstrated by the U.S. Trustee's detailed Bank Analysis, summarized in the table below, a substantial churn of funds transferred between the Debtor's business checking and savings accounts and Mr. Bartels' personal checking and savings accounts during this 8-month time period:

**<u>Transfers to/from Mr. Bartels' Personal Accounts</u>**

| | | |
|---|---|---|
| Acct x9319 August 2024 – | 13 deposits from Acct x9620 | $197,500 |
| | 16 withdrawals to Acct x9620 | ($234,000) |
| | 3 deposits from Acct x5435/0091 | $58,158.75 |
| | **Net cash-in** | **$21,658.75** |
| Acct x9319 September 2024 – | 18 deposits from Acct x9620 | $334,625 |
| | 11 withdrawals to Acct x9620 | ($122,500) |
| | One (1) withdrawal to Acct x5435 | ($1,500) |
| | **Net cash-in** | **$210,625** |

---

checking account statements reflect its payment of Mr. Bartels' personal expenses at gas stations, restaurants and food delivery, car washes, clothing purchases, Apple.com and a trip to a beauty salon during this same time frame.

| | | |
|---|---|---|
| Acct x4740 October 2024[7] – | Zero (0) deposits from Bartels' Acct | $0.00 |
| | Zero (0) withdrawals to Bartels' Acct | $0.00 |
| Acct x4740 November 2024 – | 19 deposits from Acct x2425 | $280,270 |
| | 16 withdrawals from Acct x2425 | ($162,197.48) |
| | **Net cash-in** | **$118,072.52** |
| Acct x4757 November 2024 -- | One (1) deposit from Acct x2425 | $70,000 |
| | 25 withdrawals to Acct x2425 | ($309,200) |
| | **Net cash-out** | **($239,200)** |
| Acct x4740 December 2024 – | 14 deposits from Acct x2425 | $123,049 |
| | 9 withdrawals to Acct x2425 | ($87,833) |
| | **Net cash-in** | **$35,216** |
| Acct x4757 December 2024 -- | 4 deposits from Acct x2425 | $45,000 |
| | 27 withdrawals to Acct x2425 | ($579,229.39) |
| | **Net cash-out** | **($534,229.39)** |
| Acct x4740 January 2025 – | 70 deposits from Acct x2425 | $241,556.41 |
| | 35 withdrawals to Acct x2425 | ($270,737.53) |
| | 5 deposits from Acct x4072 | $83,644 |
| | Zero withdrawals to Acct x4072 | ($0.00) |
| | **Net cash-in** | **$54,462.88** |
| Acct x4757 January 2025 – | 17 deposits from Acct x2425/Zelle | $35,907 |
| | 7 withdrawals to Acct x2425 | ($50,706) |
| | 2 deposits from Acct x4072 | $8,932.01 |
| | 1 withdrawal to Acct x4072 | ($17,500) |
| | **Net cash-out** | **($23,366.99)** |
| Acct x4740 February 2025 -- | 44 deposits from Acct x2425 | $435,696 |
| | 18 withdrawals to Acct x2425 | ($125,254) |
| | 11 deposits from Acct x4072 | $206,612.75 |
| | Zero withdrawals to Acct x4072 | ($0.00) |
| | **Net cash-in** | **$517,054.75** |
| Acct x4757 February 2025 – | 11 deposits from Acct x2425 | $77,222 |
| | 18 withdrawals to Acct x2425 | ($227,077) |

[7]Debtor closed its Wells Fargo business checking account ending in 9319 as of September 30, 2024, reportedly due to "fraud" by one or more of the MCA lenders according to Mr. Bartels' 341(a) testimony and conducted its business solely out of its business savings account until a replacement business checking account ending in 4740 was opened on October 30, 2024 by the Debtor. Thus, this entry covers only the 2-day period October 30-31, 2024.

| | | |
|---|---|---|
| | 2 deposits from Acct x4072 | $7,000 |
| | Zero withdrawals to Acct x4072 | ($0.00) |
| | **Net cash-out** | **($142,855)** |
| Acct x4740 March 2025 – | 18 deposits from Acct x2425 | $69,981.50 |
| | 14 withdrawals to Acct x2425 | ($261,601) |
| | 12 deposits from Acct x4072 | $125,001 |
| | 4 withdrawals to Acct x4072 | ($85,269) |
| | **Net cash-out** | **($151,887.50)** |
| Acct x4757 March 2025 – | 17 deposits from Acct x2425 | $250,843.50 |
| | 16 withdrawals to Acct x2425 | ($198,087) |
| | 4 deposits from Acct x4072 | $91,500 |
| | 9 withdrawals to Acct x4072 | ($107,346) |
| | **Net cash-in** | **$36,910.50** |

The end result of all of this back-and-forth activity is a total of $994,000.40 being transferred to the Debtor from Mr. Bartels' personal accounts, while at least $1,091,538.88 was withdrawn from the Debtor to Mr. Bartels, resulting in the net balance of **$97,538.48** remaining in Mr. Bartels' personal accounts as of March 31, 2025, 2 days before case commencement.

22. In this context, while the U.S. Trustee has not yet been provided with all of the bank statements requested for review and analysis, it is also notable that during the 5-month period between August 2024 and January 2025, the Debtor made numerous transfers to and from at least one additional business banking account at Bank of America. This apparent account, which is reflected Debtor's pre-petition business checking and savings account statements as "Bank of America, N./ Bnf=Luxury Time Global LLC," received a total of at least $544,050 from Debtor's checking and savings accounts from August 20, 2024 to January 15, 2025, when 5 final deposits were sent by said Bank of America account to the Debtor between January 17-28, 2025 totaling $79,500. The apparent existence of this account, which is not identified as either an open or closed account in the Debtor's schedules, indicates that the Debtor was or is conducting business via additional undisclosed avenues.

Debtor's Business Model

20. During his 341a Meeting testimony, Mr. Bartels described that the Debtor conducts its business by acting as a trusted intermediary between authorized dealers of luxury watch brands like Rolex and buyers worldwide. He testified that while the Debtor does this through a number of different "platforms," between 70% to 80% of all of the Debtor's sales are conducted through the platform, "Chrono24." In order to access the marketplace and marketing conducted on and through Chrono24, Debtor pays a $2,400.00 monthly subscription fee plus sales commissions of 3% to 6% on each item. In a typical transaction, the monies advanced by a particular buyer are deposited into something resembling an escrow account held by Chrono24 until the item is obtained and shipped to the customer, at which point, Chrono24 deducts its commission then releases the funds to the seller/authorized dealer/supplier.

21. However, Mr. Bartels testified that the Debtor also engages in direct sales, such as the situation when the Debtor transferred its customers' funds to Restivo/Star Watches Ltd. to pay for an order of luxury watches but instead of fulfilling the order, Restivo/Star Watches Ltd. applied those monies to pay all or part of a past-due balance apparently owed by the Debtor. Mr. Bartels claimed that this was an unexpected and unforeseen aberration from past transactions with Restivo/Star Watches Ltd.

22. As admitted during Mr. Bartels' § 341(a) testimony, between at least March 26, 2025 and Friday, May 9, 2025—which is one week before case commencement through five weeks post-petition— Chrono24 had the Debtor's account "on pause" which prevented the Debtor from doing business on or through that platform, causing severe additional disruption to Debtor's cashflow. Reportedly, only after long negotiations between the Debtor, Chrono24 and

their respective counsel was Debtor's access "reactivated" one business day before the May 13, 2025 341a Meeting.

23. Mr. Bartels also testified that between April and September 2024, he caused the Debtor to borrow in installments a total of $1,100,000.00 from "Peter Malak" to fund, in part or in full, the purchase of speculative watch inventory to "take advantage of deep discounts on multiple units" on the hope that these "extra" watches (i.e. watches for which no customer had placed an existing order) would appreciate in value such that the Debtor could directly sell them from its in-house stock when a future customer did place such an order. Mr. Bartels testified that he would engage in this practice "when I see an opportunity." Mr. Bartels conceded that this strategy proved unsuccessful when the MCA lenders levied upon Debtor's bank accounts, seizing its available cash, which forced the Debtor to liquidate its entire inventory in stock at a loss in order to generate additional cash for operations.

24. This shortage of cash also reportedly caused Debtor's sole employee, Director of Sales Claire Butler, to transfer $45,000.00 during the last week of November 2024 (an amount representing over half of her annual salary of $85,000.00) to the Debtor. Mr. Bartels testified that he was unsure if this was a gift or a loan to the Debtor; Claire Butler is not an insider, holds no equity interest in the Debtor and is not listed as one of Debtor's creditors.

<u>Debtor's Sparse and Incomplete Business Records</u>

25. Despite the multi-stage, multiple party, high-dollar nature of all of Debtor's transactions, as admitted by <u>Debtor-in-Possession's Affidavit as to Filing of Certain Tax Returns and Financial Statements</u> ("Debtor's Affidavit") [Doc. No. 7, filed on April 3, 2025], as of the April 2, 2025 case commencement date, "No Balance Sheet or Statement of Operations has been prepared … [and] No Statement of Income and Expenses for the 12 months Ending December 31

…”. Instead, Debtor promised that these required financial statements would be prepared by an unidentified accountant “shortly after the application to employ the accountant is approved.”

26. Therefore, as the U.S. Trustee has discussed with Debtor and its counsel since the April 14, 2025 IDI, an accountant’s assistance is admittedly necessary to provide an accurate financial foundation for Debtor’s ongoing financial reporting, as well as for the formulation of any plan. Nevertheless, it has taken until May 17, 2025—more than 6 weeks after case commencement— for the Debtor to file its long-promised application to retain CPA/Financial Professional Brian T. Kelly with the Court [Doc. No. 35]. The incomplete nature and deficiencies exhibited in Debtor’s first MOR filed on May 21, 2025 serve only to underscore Debtor’s apparent need for such professional financial assistance.

27. Indeed, even setting aside the drawn-out efforts to retain a financial professional, when the U.S. Trustee questioned Mr. Bartels about the 6-month Profit and Loss Statement attached to Debtor’s Affidavit, covering September 2024 to February 2025, during the 341a Meeting, he testified that despite displaying “Net Profit” totaling $97,040.00 for the months of November 2024 through February 2025, that calculation inexplicably did not include Debtor’s daily/weekly payments via ACH withdrawal to the MCA lenders. This was Mr. Bartels’ explanation for the sizable difference between Debtor’s 6-month Profit and Loss Statement and Debtor’s reported balance of one dollar ($1.00) as the combined total of its business checking and savings accounts as of case commencement on April 2, 2025.

28. Moreover, despite Debtor’s reported reliance upon its outside accountant for the preparation and proper content of its financial records and statements, Mr. Bartels testified that the Debtor’s financial books and records exist primarily as digital documents, retained only on Mr. Bartels’ laptop and backed up to his cloud account, and reportedly not retained in any form

by any outside accountant or financial professional. Indeed, the Debtor has no in-house financial staff or bookkeeper, relying instead upon Mr. Bartels alone.[8]

**"Cause" for Conversion or Dismissal**

Failure to File Other Necessary Documents.

29. Upon electing to be a debtor under Subchapter V, the Debtor was required to file with the Court, among other things, the Debtor's most recent balance sheet, statement of operations, and cash-flow statement (or an affidavit that one or more of these documents have not been prepared). 11 U.S.C. § 1187, incorporating § 1116(1). While the Debtor's Affidavit of April 3, 2025 admits that none of these documents has been prepared, Debtor promised that they would all be prepared once its accountant was retained. Despite this, however, no such employment application for Debtor's proposed accountant was filed until May 17, 2025, 6 weeks after case commencement.

Deficient Monthly Operating Reports.

30. 11 U.S.C. §§ 308(b), 704(a)(8), 1106(a)(1), 1116(4), 1184, and 1187 collectively require the Debtor to file with the Court and furnish to the U.S. Trustee certain financial reports. Despite this, as described herein, not only is the Debtor delinquent in providing requested additional bank statements regarding the flow of Debtor's funds back and forth from the various personal bank accounts of its sole principal, Mr. Bartels (see below), the contents of its very first MOR are woefully deficient.

31. The U.S. Trustee cannot perform his statutory monitoring function without the aid of current and accurate financial information. This lack of financial accountability evidences a

[8]Mr. Bartels testified that Claire Butler, Debtor's sole employee and Director of Sales, has no access to any of Debtor's bank accounts, accounting software or financial records.

serious disregard for the fiduciary responsibilities assigned to the Debtor. The Debtor's failure to file complete and accurate financial reports constitutes "cause" for conversion of this case under 11 U.S.C. § 1112(b)(4)(E), (F), and (H); *see also In re Four Wells Ltd.*, 2016 WL 1445393, at *10 (B.A.P. 6th Cir. Apr. 12, 2016) (citations omitted). ]

Delinquent or Incomplete IDI Requested Documents.

32. The Debtor has failed to provide a copy of the following documents requested by the U.S. Trustee from the Debtor at the IDI and the 341(a) Meeting:

a. Mr. Bartels' Wells Fargo Premier Checking account, ending in x9620, for the period January 1, 2024 to the present;

b. Mr. Bartels' Wells Fargo Business Platinum Savings account, ending in x8605, for the period January 1, 2024 to the present;

c. Mr. Bartels' Wells Fargo Platinum Savings account, ending in x5435, for the period January 1, 2024 to the present;

d. Mr. Bartels' Wells Fargo Premier Checking account, ending in x 2425, for the period January 1, 2024 to the present;

e. Mr. Bartels' Wells Fargo Way2Save Savings account, ending in x0091, for the period January 1, 2024 to the present;

f. Mr. Bartels' Cash App for the period January 1, 2024 to the present; and

g. A copy of the underlying vehicle sales contract or vehicle lease for a BMW X6 midsize coupe SUV associated with Debtor's recurring monthly payment to "BMW USA" including its reported surrender by Mr. Bartels in or about April or May 2025; and

h. Debtor's income tax returns for 2024, when available.

As a result, the U.S. Trustee is unable to determine whether the Debtor has complied with its statutory reporting requirements. The Debtor's continuing failure to timely provide the requested documents constitutes "cause" for conversion of this case under 11 U.S.C. § 1112(b)(4)(E) and (H).

Unreasonable Delay Prejudicial to Creditors.

33. The Debtor's financial reporting obligations and deficiencies were brought to the Debtor and its counsel's attention early in this case at the IDI on April 14, 2025, and the § 341(a) examinations on May 6, 2025 and May 13, 2025. In addition, the U.S. Trustee has notified and reminded the Debtor, through its proposed counsel, on an informal basis on numerous occasions of its reporting obligations.

34. Moreover, despite having voluntarily filed its bankruptcy case on April 2, 2025, the Debtor waited until May 17, 2025 to seek court approval to employ an accountant [Doc. No. 35], whose assistance is apparently needed to ensure the accuracy of any monthly operating reports and to prepare outstanding income tax returns. The Debtor's unreasonable delay in obtaining adequate accounting assistance for this estate is prejudicial to creditors and likewise warrants conversion or dismissal.

35. Subchapter V chapter 11 cases are designed to move quickly and for that reason, Debtor is expected to file a plan within ninety days of the petition, absent extraordinary circumstances beyond the debtor's control. *See* 11 U.S.C. § 1189. Here, more than 6 weeks into the case, Debtor has only just filed its employment application to retain the required financial reporting services of a CPA.

36. Moreover, as revealed at the 341(a) Meeting concluded on May 13, 2025, Debtor's May 2, 2025 bankruptcy schedules and statements remain incorrect and incomplete,

lacking a number of creditors as well as at least one material asset—an undisclosed account receivable asset comprised of paid-for but undelivered luxury watches from Restivo, valued by Mr. Bartels at $719,000.00. Further, while Mr. Bartels has admittedly personally guaranteed the obligations owed by the Debtor to all of its MCA lenders, the amounts paid to those MCA lenders is only listed for the 90-day pre-petition period in Part 2, item 3 of the Statement of Financial Affairs, rather than for the 1-year pre-petition period in item 4 of same.

37. Under these circumstances, it is highly unlikely the Debtor will be able to propose a plan timely, let alone one that stands a chance of confirmation. *See* 11 U.S.C. § 1112(b)(4)(J), (M) (failure to file or confirm a plan within time fixed by court); (inability to effectuate substantial consummation of a confirmed plan).

<u>Indicia of Bad Faith Filing and Gross Mismanagement</u>.

38. While no single test has been established for determining whether a petition has been filed in bad faith, the Sixth Circuit has set forth eight factors to aid courts in conducting a "careful, flexible analysis":

a. The debtor has one asset.

b. The pre-petition conduct of the debtor has been improper.

c. There are only a few unsecured creditors.

d. The debtor's property has been posted for foreclosure, and the debtor has been unsuccessful in defending against the foreclosure in state court.

e. The debtor and one creditor have proceeded to a standstill in state court litigation, and the debtor has lost or has been required to post a bond which it cannot afford.

f. The filing of the petition effectively allows the debtor to evade court orders.

g. The debtor has no ongoing business or employees.

h. The lack of possibility of reorganization.

*In re Village Gate, LLC*, 2024 WL 4236407, at *7 (Bankr. S.D. Ohio Sept. 17, 2024) (citing *Trident Assocs. Ltd. P'ship v. Metro. Life Ins. Co. (In re Trident Assocs. Ltd. P'ship)*, 52 F.3d 127, 131 (6th Cir. 1995)).

39. While not all of the *Trident* factors in are present here, the Debtor's bankruptcy filing bears several hallmarks of a bad faith filing. While Debtor has listed a single dollar in its bank accounts and its empty display cases as its only physical assets, with or without the inclusion of its still-unscheduled account receivable asset from Restivo, Debtor has essentially only one asset—its ongoing sale of luxury watches to a select customer base. Debtor's ability to continue to monetize this asset relies upon its tenuous ability to maintain customer confidence to deliver the luxury watches on-demand, for the promised price and in the promised condition, all of which rely upon factors, entities and individuals outside of Debtor's direct control.

40. Additionally, by using the Debtor to fund his prolific pre-petition gambling activities, Mr. Bartels, the Debtor's sole and managing member, has wrought significant damage upon the Debtor's cashflow and necessitated its heavily leveraged, high interest borrowing from the MCA lenders. In addition, Mr. Bartels also caused the net sum of hundreds of thousands of dollars to be transferred from the Debtor's business accounts to his personal checking and savings accounts for the entire calendar year 2024, which Mr. Bartels' § 341(a) testimony admitted was at least in part done to divert funds from Debtor's MCA lender-creditors. While Mr. Bartels has sought to justify his use of nearly two million dollars of Debtor's business funds as his "compensation," these matters are more properly reviewed by an independent fiduciary, as a chapter 7 trustee would be, to determine whether the estate has any recourse with respect to any

of the prepetition actions taken by Mr. Bartels, and by extension, the Debtor over which Mr. Bartels still exercises sole authority and control.

41. The Debtor, through Mr. Bartels, has blamed much of its need to file for bankruptcy on the alleged fraud committed against it by the MCA lenders. Nevertheless, the only claims filed by the Debtor against any of the MCA lenders have been adversary proceedings to avoid alleged preferential payments during the 90-day (not one-year) pre-petition period, with no overt allegation of any fraud for breach of the underlying borrowing instruments. If the Debtor is unable or unwilling to pursue actions against the MCA lenders for the benefit of its creditors, that may also indicate that the Debtor is engaged in gross mismanagement of the estate. 11 U.S.C. § 1112(b)(4)(B). The Court should convert this case so that an independent fiduciary can determine whether such claims are viable and may be available to provide a distribution to unsecured creditors.

42. In sum, the circumstances surrounding the commencement of its chapter 11 case and the manner in which it, and Mr. Bartels, its Managing Member, have proceeded thus far are indicative of a Debtor who wishes to continue to avoid payment of its creditors, litigate causes of action which have not borne fruit to date, and insulate Mr. Bartels' self-interested high-stakes gambling activities using the Debtor's funds from its creditors, rather than a legitimate attempt to reorganize under chapter 11. The Court should therefore find that there is "cause" to convert or dismiss the Debtor's case under 11 U.S.C. § 1112(b)(1).

**Relief Requested**

37. Under 11 U.S.C. § 1112(b)(1), the Court must determine whether "cause" exists to convert or dismiss the Debtor's case. § 1112(b) enumerates sixteen non-exhaustive examples of "cause." *See In re Creekside Sr. Apts., L.P.*, 489 B.R. at 60 (§ 1112(b) examples non-

exhaustive). Whether "cause" exists is a question left to the sound discretion of the bankruptcy court. *In re Four Wells Ltd.*, 2016 WL 1445393, at *9.

38. As explained in the paragraphs above, the U.S. Trustee contends that "cause" exists to convert or dismiss the Debtor's case under 11 U.S.C. §§ 1112(b)(4)(A), (B), (E), (F), (H), (J), and (M). Despite this case being pending for nearly 8 weeks, the Debtor has failed to fulfill its duties as a debtor under Chapter 11 by complying with its financial reporting requirements, providing documents reasonably requested by the U.S. Trustee, providing a feasible framework for repayment of its creditors, and filing its petition in good faith. Thus, there is ample "cause" to convert or dismiss this case.

39. Once the Court determines that "cause" exists, it must convert to chapter 7 or dismiss the Debtor's case, whichever is in the best interests of creditors and the estate. 11 U.S.C. § 1112(b)(1). The U.S. Trustee is unaware of any unusual circumstances which would prevent the Court from converting this case to chapter 7 under 11 U.S.C. § 1112(b)(2). As described above, there are numerous potential transfers and other actions which may be administrable by an independent chapter 7 trustee. Therefore, the U.S. Trustee would recommend conversion as the appropriate remedy.

WHEREFORE, the U.S. Trustee respectfully requests that the Court:

A. Convert these reorganization proceedings to a liquidation case under chapter 7 or, in the alternative, dismiss the Debtor's case pursuant to 11 U.S.C. § 1112(b)(1); and further,

B. Grant such other relief that may be proper under the circumstances.

ANDREW R. VARA
United States Trustee
Regions 3 and 9

Dated: May 27, 2025

Joseph P. Schalk
Acting Assistant United States Trustee

By: /s/ Kenneth G. Lau
Kenneth G. Lau, Trial Attorney
United States Department of Justice
Office of the United States Trustee
Middle District of Pennsylvania
1501 N. 6th Street, Box 302
Harrisburg, PA 17102
Phone: (616) 456-2485
Email: Kenneth.G.Lau@usdoj.gov

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| IN RE: | : | CHAPTER 11 |
| LUXURY TIME GLOBAL, LLC, | : | CASE NO. 5:25-bk-00912-MJC |
| DEBTOR | : | |
| ANDREW R. VARA<br>UNITED STATES TRUSTEE, | : | |
| Movant | : | |
| vs. | : | |
| LUXURY TIME GLOBAL, LLC, | : | |
| Respondent | : | |

**ORDER**

Upon consideration of the motion of the United States Trustee to convert the reorganization proceedings of Debtor Luxury Time Global, LLC ("Debtor") to a liquidation case under chapter 7 or, in the alternative, dismiss the Debtor's case pursuant to 11 U.S.C. § 1112(b)(1), and the record as a whole, it is HEREBY ORDERED:

The United States Trustee's motion is GRANTED; and

The Debtor's reorganization proceedings are CONVERTED to a liquidation case under chapter 7 or;

[In the alternative] The Debtor's case is DISMISSED pursuant to 11 U.S.C. § 1112(b)(1).

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE: | : | CHAPTER 11 |
| | : | |
| LUXURY TIME GLOBAL, LLC | : | CASE NO. 5:25-bk-00912-MJC |
| | : | |
| DEBTOR | : | |

**CERTIFICATE OF SERVICE**

I hereby certify that on May 27, 2025, I electronically filed the foregoing representing service of the United States Trustee's Motion for Conversion or Dismissal with the Clerk of the Bankruptcy Court using the CM/ECF system which sent notification of such filing to the following Filing Users at the following e-mail address:

John J. Martin, Esquire
Email: jmartin@martin-law.net

Lisa M. Doran, Esquire
Email: ldoran@dorananddoran.com

Anthony Higgins, Esquire
Email: ra-li-ucts-bankhbg@state.pa.us

C. Stephen Gurdin, Jr., Esquire
Email: Stephen@gurdinlaw.com

Jill E. Durkin, Esquire
Email: jilldurkinesq@gmail.com

ANDREW R. VARA
UNITED STATES TRUSTEE
REGIONS 3 & 9

Joseph P. Schalk
Acting Assistant United States Trustee

By:/s/ Kenneth G. Lau
Kenneth G. Lau, Trial Attorney
United States Department of Justice
Office of the United States Trustee
Middle District of Pennsylvania
1501 N. 6th Street, Box 302
Harrisburg, PA 17102
Phone: (616) 456-2485
Email: Kenneth.G.Lau@usdoj.gov